UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| PHARMACY SERVICES, INC.<br>Plaintiff,<br><br>VS.<br><br>SWAROVSKI NORTH AMERICA, LTD.,<br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>: | C.A. NO.: 04-72T |

**PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Now comes the Plaintiff, Pharmacy Services, Inc., in the above-entitled matter and Objects to the Defendant's Motion for Summary Judgment. A Memorandum of Law in support of this Objection has been filed of even date herewith. Plaintiff has further filed its Response to the Defendant's "Statement of Undisputed Facts".

**WHEREFORE**, the Plaintiff, Pharmacy Services, Inc., requests that this Honorable Court deny the Defendant's Motion for Summary Judgment.

Plaintiff,
**Pharmacy Services, Inc.**
By its Attorneys,
*KLAFTER & MASON*

Gary L. Mason, Esq. *(Pro Hac Vice)*
Manalapan Corporate Plaza
195 Route 95 South, Suite 204
Manalapan, NJ 07726

*LAW OFFICES OF CAROL A. ZANGARI*

CAROL A. ZANGARI (#2130) *(Local Counsel)*
The Wilcox Building
42 Weybosset Street
Providence, Rhode Island 02903
401.831.1999
401.454.8309 (Fax)

Dated: August 15, 2005

## CERTIFICATION

I hereby certify that on the 15th day of August, 2005, a true copy of the foregoing Objection was faxed and mailed to **MICHAEL A. GAMBOLI, ESQ.**, Partridge, Snow & Hahn, LLP, 180 South Main Street, Providence, RI 02903-7120.

Law Offices of Carol A. Zangari

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **PHARMACY SERVICES, INC., t/a ROSELLE CENTER PHARMACY, a/k/a Roselle Center Card, Gift & Collectibles,** **Plaintiff,** | **Case No. 04-72T** |
| **vs.** | **Civil Action** |
| **SWAROVSKI NORTH AMERICA, LTD., JOHN DOES 1-50 and ABC CORPS. 1-10,** **Defendants.** | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

Pharmacy Services, Inc., t/a Roselle Center Pharmacy, a/k/a Roselle Center Card, Gift & Collectibles, the above-captioned plaintiff ("Plaintiff"), submits this memorandum of law in opposition to defendant's motion for summary judgment. For the reasons set forth herein, Plaintiff respectfully submits that genuine issues of material fact exist with respect to each of Plaintiff's remaining causes of action[1] and, therefore, defendant's motion must be denied.

---

[1]/ *The remaining Counts are for misrepresentation (Count 2), tortious interference with economic advantage (Count 3), civil conspiracy (Count 4), unfair competition (Count 5) and punitive damages (Count 6). Plaintiff does not oppose dismissal of Count 4, the civil conspiracy count.*

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

**A. Summary Judgment Standard.**

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on a summary judgment motion:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). The critical inquiry is whether a genuine issue of material fact exists. *Menebhi v. Mattos*, 183 *F. Supp.2d* 490, 498 (D.R.I.2002). There is a genuine dispute over a material fact when the evidence is such that a reasonable jury could find for the non-moving party. *Morrissey v. Boston Five Cents Sav. Bank*, 54 *F.3d* 27, 31 (1st Cir.1995)(*quoting Anderson v. Liberty Lobby, Inc.*, 477 *U.S.* 242, 248, 106 *S.Ct.* 2505, 91 *L.Ed.2d* 202 (1986)).

In determining whether summary judgment is appropriate, the Court must view the facts in the record and all inferences therefrom in the light most favorable to the non-moving party. *Springfield Terminal Ry. Co. v. Canadian Pacific Limited*, 133 *F.3d* 103, 106 (1st Cir. 1997). Where the facts support plausible yet conflicting inferences on a central issue in the case, the Court may not choose between such inferences on a motion for summary judgment. *Menebhi*, 183 *F. Supp.2d* at 498 (*citing Coyne v. Taber Partners I*, 53 *F.3d* 454, 460 (1st Cir.1995)). That choice is properly left in the hands of a jury.

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

To prevail on a summary judgment motion, the moving party must identify the portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *DeNovellis v. Shalala,* 124 *F.3d* 298, 306 (1st Cir.1997)(*citing Celotex Corp. v. Catrett,* 477 *U.S.* 317, 323, 106 *S.Ct.* 2548, 91 *L.Ed.2d* 265 (1986)); *McConaghy v. Sequa Corp.,* 294 *F.Supp.2d* 151, 159 (D.R.I.2003). The party opposing summary judgment may not rest upon mere allegations or denials in its pleading and has an affirmative duty to set forth specific facts showing a genuine issue of fact to be resolved at trial. *Russian v. Life-Cap Tire Services*, 608 *A.2d* 1145, 1147 (R.I.1992). The ultimate test is whether or not, as to each essential element, there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *DeNovellis*, 124 *F.3d* at 306 (*citing Anderson*, 477 *U.S.* at 249-50, 106 *S.Ct.* 2505).

In determining the existence of a genuine dispute concerning a "material fact," the Court is guided by the definition of "material facts" as those facts 'that might affect the outcome of the suit under the governing law." *Morrissey*, 54 *F.3d* at 31. There is a genuine dispute over a material fact when the evidence is such that a reasonable jury could find for the non-moving party. *Id.*

Summary judgment "is not appropriate merely because the facts offered by the moving party seem most plausible, or because the opponent is unlikely to prevail at trial." *Gannon v. Narragansett Elec. Co.*, 777 *F. Supp.* 167, 169 (D.R.I.1991). At the

summary judgment stage, there is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose his own ideas of probability and likelihood." *Greenburg v. Puerto Rico Maritime Shipping Auth.*, 835 *F.2d* 932, 936 (1st Cir.1987). Summary judgment is only available when there is no dispute as to any material fact and only questions of law remain. *See Blackie v. Maine*, 75 *F.3d* 716, 721 (1st Cir.1996).

In the case at bar, genuine issues of material fact exist with respect to each of Plaintiff's causes of action. Accordingly, defendant's motion must be denied in its entirety.

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

**B. Count 2 Of Plaintiff's Complaint Must Survive Summary Judgment Because Genuine Issues Of Material Fact Exist With Regard To, Among Other Things, The Concealment Of Certain Facts Which May Have Changed Plaintiff's Decision To Become One Of Defendant's Authorized Retailers.**

Count 2 of Plaintiff's complaint alleges fraudulent misrepresentation. In order for a plaintiff to recover for fraud, he must prove that the defendant made a misrepresentation of a presently existing material fact, or intentionally failed to disclose a material fact. *Grassi v. Gomberg*, 81 *R.I.* 302 (1954). The defendant must know of the falsity of his statement. *Conti v. Walter Winters*, 86 *R.I.* 456 (1958); *Halpert v. Rosenthal*, 107 *R.I.* 406 (1970). Further, the plaintiff must prove that the defendant made the false statements, or concealed the material facts, for the purpose

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

of inducing the plaintiff to act. *DiChiaro v. Spirito*, 89 *R.I.* 50 (1959). In terms of reliance, the plaintiff must show that he relied reasonably upon the defendant's statements. Thus, to defeat defendant's summary judgment in this matter, Plaintiff must present a genuine issue of material fact with respect to any one (1) or more of these elements.

A misrepresentation becomes material when it is likely to affect the conduct of a reasonable person with reference to the transaction with another. *Dudzik v. Leesona Corp.*, 473 *A.2d* 764 (R.I. 1984). Under Rhode Island law, fraud may be grounded in either affirmative acts or concealment. *In Re DiMartino*, 108 *B.R.* 394 (D.R.I. 1989). Fraud can also be established by silence where the business relationship of the parties is such as to create a duty to disclose certain facts. *Kennett-Murray Corp v. Bone*, 622 *F.2d* 887, 892 n.4 (1980). However, since fraud can lie when material facts are concealed, as in the case at bar, a legal duty to disclose need not be present.

The Rhode Island Supreme Court has held that an innocent misrepresentation of a material fact may also be actionable if it induces reliance. *Halpert,* 107 *R.I.* at 415. A misrepresentation occurs when there is a " 'manifestation by words or other conduct by one person to another that, under the circumstances, amounts to an assertion not in accordance with the facts.' " *Halpert,* 107 *R.I.* at 413. A misrepresentation becomes material when it is likely to affect the conduct of a reasonable person with reference to a transaction with another person. *Id.* Notably, a

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

party to a contract generally may challenge that contract on basis of fraud or misrepresentation, even if the party is negligent in signing contract without reading it. *St. Paul Fire & Marine Insurance Co. v. Russo Brothers, Inc.*, 641 *A.2d* 1297, 1299 (R.I. 1994).

In short, Plaintiff's misrepresentation/fraudulent concealment claim arises out of defendant's failure to advise Plaintiff in 1999 when Plaintiff executed the authorized retailer contract, that defendant: (i) intended to actually eliminate its authorized retailers and was in the process of doing so; (ii) intended to invest a significant amount of time, energy and money opening its own corporate galleries which would compete with its independent retailers; and, (iii) intended to devote time, energy and money into internet sales.

It is undisputed that, at the time Plaintiff and defendant entered into the authorized retailer contract, defendant knew that it was going to pursue a course of action to close stores. Indeed, Morton testified that Mission 3000 came into existence in 1998/1999. The whole purpose of Mission 3000 was to eliminate retailers. In fact, Morton indicated that defendant's plans included reducing defendant's 18,000 worldwide doors to 3,000 - more than an eighty percent (80%) reduction in doors. That fact is, unequivocally, a material factor to any business in determining whether or not to enter into a contractual relationship, especially since the reason defendant gave for Plaintiff's closure, almost three (3) years into its relationship, was the

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

Mission 3000 concept!! Thus, the facts that defendant concealed in 1999 when Plaintiff executed the authorized retailer contract are the exact same facts upon which defendant relied in terminating Plaintiff's authorized retailer license. This fact is particularly critical when, according to defendant, the parties' contract provides defendant with the unfettered right to terminate a retailer's license at any time, for no reason.

Defendant amusingly suggests that, in 1999, it had no duty to disclose to Plaintiff the Mission 3000 plan or defendant's business strategy in eliminating retailers. Yet, three (3) years later, defendant terminated Plaintiff's authorized retailer license based on the exact information it concealed from Plaintiff in 1999. Conspicuous by its absence in defendant's moving papers is any caselaw placing in this Court's hands the decision to determine whether or not defendant had a legal duty to disclose these facts. Rather, that question is a factual one and must be left to the fact-finder. Moreover, as stated above, a legal duty need not exist because the mere concealment of a material fact is sufficient to sustain a cause of action for misrepresentation. *In Re DiMartino*, 108 *B.R.* 394 (D.R.I. 1989). Under these circumstances, where the sole basis for Plaintiff's closure, according to the testimony of defendant's own representatives, was these new standards applied in the context of Mission 3000, whether or not defendant should have disclosed the same to Plaintiff in 1999 is a question of fact that cannot be resolved by summary judgment.

The inconsistencies and sheer contradictions in defendant's testimony is, in itself, sufficient to defeat summary judgment. For example, defendant relies exclusively on these amorphous Mission 3000 standards as a basis for terminating Plaintiff's authorized retailer license. Whitney testified that the decision regarding whether or not to close an account was always discussed with Morton (the Vice President of Sales), who was Whitney's superior. Yet, the record is void of any evidence demonstrating that Morton knew about or even participated in the decision to terminate Plaintiff's license. Further, Bono, a regional sales manager with defendant for almost fifteen (15) years testified that Mission 3000 meant nothing to him and that he had never terminated an account based on this concept.

McFarland claimed that her recommendation to close Plaintiff's account was based on Mission 3000 standards, and specifically that Plaintiff would not be an account defendant would open today. Yet, many stores with similar characteristics remain open, such as stores selling cards, lottery tickets, located in a strip malls and which discount the retail prices. McFarland's recommendation to close Plaintiff's account came less than two (2) weeks after another sales manager in California recommended the closure of Hermann's Crystal, an authorized retailer located in California who, like Plaintiff, had invested significant time, energy and money on internet marketing and was consistently in the top three (3) "hits" for defendant's product.

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

Whitney's telephone call to McFarland was triggered by his internet search for businesses using the Swarovski name and his alleged concerns centered around the product advertised on the website and Plaintiff's pricing strategies. Whitney testified that retailers were not prohibited from discounting, so his concerns about pricing strategy are suspect. Further, his concerns about Plaintiff's product line are suspicious based on the fact that the majority of Plaintiff's product-line consisted of high-end merchandise, such as Swarovski, Armani, Hummel, Lladro, Waterford, Lenox, and the like.

Bednarski, a district sales manager with defendant for approximately ten (10) years, testified that, with the exception of Plaintiff's closure, her district sales manager has **never** asked her to prepare a memorandum similar to her November 26, 2002 e-mail in which she recommended an account's closure. Significantly, defendant appears to use the August 2002 meeting when Bednarski and McFarland met at Plaintiff's business as the springboard for the termination. However, in the wake of the facts that have surfaced regarding the chronology of events, this makes absolutely no sense. Bednarski testified that it was at this August 2002 meeting when McFarland told her to close Plaintiff's account. She also testified that in October 2002, she invited "key accounts" to a training session at the Woodbridge, New Jersey Sheraton. It is not disputed that Plaintiff was invited to attend this training session. If, in August 2002, McFarland told Bednarski to close Plaintiff's account, and if, as

McFarland testified in her affidavit, in the months that followed, she reminded Bednarski to close Plaintiff's account several times, why in the world did Bednarski invite Plaintiff to the October 2002 training session?

The answer is clear. The August 2002 meeting did not, in any way, result in anyone's decision to terminate Plaintiff's license. Rather, what triggered the decision was Whitney stumbling upon Plaintiff's website. More particularly, he stumbled upon the fact that when he entered the name Swarovski, Plaintiff's website appeared in the number one position. This intrigued Whitney since, according to the Mission 3000 document, one of defendant's primary goals was to push its website and increase internet sales. He contacted McFarland who had discovered only a few months before at the August 2002 meeting, that Plaintiff had significantly increased its revenue through its internet sales and on-line marketing. Whitney thought that this was a market he could get his hands on simply by terminating Plaintiff's authorized retailer license, and that is exactly what he did. There was no "extensive review by all levels of management" with respect to Plaintiff's account closure, as set forth in the Termination Letter. Certainly, there is no evidence to support any kind of review. Morton, the Vice President of Sales was not even involved in the decision. The absence of any facts supporting defendant's contention that there was an "extensive review by all levels of management," creates a factual question regarding the representations contained in the Termination Letter.

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

Whitney made this decision on his own, without any investigation, without participation from anyone else, for the sole purpose of eliminating Plaintiff as an internet competitor. All of the foregoing facts are important in the context of Plaintiff's unfair competition claim, discussed below, but also critical in the global context of this summary judgment motion because they represent numerous examples of contradictions, inconsistencies and implausibilities in defendant's testimony. Those contradictions, inconsistencies and implausibilities raise credibility issues which are always questions of fact for the jury.

In addition to all of the foregoing, defendant intentionally chose to conceal from Plaintiff the fact that the company was making a big push to open its own corporately owned galleries. According to Bono, in or about 1999, defendant made the decision to push the opening of its own galleries. This can clearly be gleaned from Exhibit B to the Mason Cert. demonstrating that defendant's corporately owned galleries went from seven (7) in 1999 to over sixty (60) in 2004. This would have been a material fact related to Plaintiff's decision since defendant's marketing plans placed it in direct competition with its authorized retailers.

Defendant knew, in 1999, that it intended to increase its retail presence and its internet presence. Defendant also knew, in 1999, that it intended to **reduce** the number of retailers authorized to sell defendant's product. All of these facts would have been significant to Plaintiff's decision - or to any retailer's decision - whether or

not to enter into a business relationship with defendant. Plaintiff went to great lengths to market defendant's product both on the internet and in its retail store. Plaintiff spent time, energy and money building a customer base grounded in defendant's product just to have that customer base ripped out from under it only three (3) years later because defendant simply wanted to eliminate the competition produced by its authorized retailers.

Plaintiff's representative testified that no one bothered to review with him the authorized retailer contract or the Standards and that those documents were simply placed in front of him to sign. Plaintiff's representative further testified that he had no idea their account could be closed at any time, for no reason and that so long as Plaintiff sold merchandise and made money for the company, there should have been no reason for the account to be closed. As noted above, a party to a contract may challenge that contract on basis of fraud or misrepresentation, even if the party is negligent in signing contract without reading it. *St. Paul Fire & Marine Insurance Co. v. Russo Brothers, Inc.*, 641 *A.2d* 1297, 1299 (R.I. 1994).

In light of Plaintiff's understanding or, rather, lack of understanding, it was increasingly critical that defendant disclose to Plaintiff its current plans of closing a significant amount of independent retailers, expanding its internet presence and e-commerce abilities and increasing its corporately owned galleries from seven (7) in 1999 to over sixty (60) in 2004. These facts were, without a doubt, material facts that

**KLAFTER & MASON, L.L.C.**
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

should have been disclosed to Plaintiff in 1999. They were facts that defendant knew and intentionally concealed. Genuine and material factual disputes exist with respect to each element of Plaintiff's claim for misrepresentation. Accordingly, defendant's motion for summary judgment must be denied with respect to Count 2 of Plaintiff's complaint.

**C. Count 5 Of Plaintiff's Complaint Must Survive Summary Judgment Because Genuine Issues Of Material Fact Exist With Regard To, Among Other Things, Defendant's Efforts To Confuse Existing Customers And Setup Defendant's Plan To Convert Plaintiff's Customers Into Customers Who Purchased Directly From Defendant.**

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

Although the common-law action for unfair competition evolved originally to afford relief against a competitor's misrepresentation of the source of goods or services, the term "unfair competition" now describes an array of legal actions addressing methods of competition that improperly interfere with the legitimate commercial interests of other sellers in the marketplace.

Unfair competition occurs when "the device or means employed would be likely to confuse and mislead the public generally to purchase the product or patronize the shop of one person when the actual intention was to purchase the product or patronize the shop of another." *Merlino v. Schmetz*, 66 *R.I.* 425, 428 (1941). The Court has also approved of the concept of "secondary meaning" with regard to unfair competition cases. *See Charles J. Donnelly, Inc. v. Donnelly Bros., Inc.*, 96 *R.I.* 255, 261 (1963); *Bostitch, Inc. v. King Fastener Co.*, 87 *R.I.* 274, 285

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

(1958). In *Donnelly Bros., Inc.*, the Court stated:

> Every man has in common the right to use a descriptive term in the advertising of his services or goods, unless another offering the same services or marketing the same product has, by prior and continuous use thereof, given to a particular descriptive term a secondary meaning which in the public mind identifies the user with the particular services or goods.

*Donnelly Bros., Inc.*, 96 *R.I.* at 261.

Whether the evidence has established that the potential customer base identifies the producer or his goods with the trade name in question is necessarily a matter of proof, but a party may make such a showing by inference. *Id.* at 263. Moreover, a party need not show "actual confusion, but whether confusion and deceptions are **likely to occur** ...." (emphasis added). *Bostitch, Inc. v. King Fastener Co.*, 87 *R.I.* 274, 288 (1958).

In the case at bar, all facts point to defendant's attempt to confuse the customer and lead them into the direction of purchasing directly from defendant. In July 2001, defendant announced that it was going to sell directly to consumers over the internet. Along with this announcement, defendant changed its packaging and included promotional material that invited consumers to visit www.swarovski.com where they could buy direct from defendant. Plaintiff explained the inevitable confusion to the customer during his deposition:

> I think it was more of a structure of their entire plan. That their plan was to go after businesses that - I mean, we did in-store sales too. I mean, we did almost $40,000.00, if I'm not mistaken, the previous year

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

> but their attitude seems to be and I could be wrong but their attitude is, hey, wait a minute, this guy increased his business. He [Whitney] tells Cheryl [McFarland] in August of 2002 - how did your business increase? He mentions the website. Now our plan is to push our website. We're going to integrate our website, www.swarovski.com. We're going to put Swarovski on the world. On every package, on every mail, on every piece of paper to every customer. We're going to try to confuse our customers every way we can so that when now www.giftandcollectibles.com, which has always been up number one, is gone, all these people who are looking at their product are going, where did I buy this? I forgot where I bought this. Oh, I must have gotten it through www.swarovski.com. So now we're in the pool, they throw us out. There is nothing wrong - I have no problem with competing with anybody. I don't care who they are but you know what, to throw us out of the pool and grab the customer base and confuse the customer, put www.swarovski.com on the world and say, thank you very much, is ridiculous. That's the whole scope of what I feel has gone on from day one. I think Swarovski in their own stores, their website, push, push, push. Danielle [Bednarski] praises us up and down, left and right. Even after a meeting in August 2002, we're praised because we're a key account that's invited to a seminar. Next thing you know, no return phone calls, we're closed.

*Schulman Dep. at 69:12 - 70:22.*

In essence, defendant used its re-designed packaging, specifically, but not limited to, the new insert that invited the customer to visit www.swarovski.com where they could buy direct from defendant, together with its push to expand its e-commerce business and increase its retail stores, to confuse Plaintiff's customers and lead them right into defendant's pockets. This is evidenced most clearly with the members of the SCS. In fact, Mission 3000 makes a specific reference to retaining a closed account's SCS members. *Mason Cert. Exhibit A at SNA633.* Mission 3000 also made selling defendant's product on-line and off-line through defendant's

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

corporately owned galleries the number one priority, *Mason Cert. Exhibit A at SNA 632,* and focused on defendant's e-business and selling direct to consumers via defendant's revamped website. *Id. at SNA 657-661.*

Any customer, particularly SCS members, who regularly purchased product from Plaintiff's website would no longer find Plaintiff's website as the result of a search for Swarovski product. Rather, they would find defendant's revamped website which now offered direct sales capabilities. Significantly, defendant's website was never anywhere near the top of the list when a customer would search for defendant's product. However, after Plaintiff's account was closed and Plaintiff could no longer market defendant's product, defendant's website miraculously appeared in the number one (1) or number (2) position. Defendant had wiped out the e-commerce competition, had absorbed Plaintiff's SCS members and, now, had taken over the number one (1) position on the internet that, throughout tireless efforts, a significant financial investment and constant monitoring, Plaintiff had previously occupied.

Moreover, when the customer could not locate Plaintiff's website, or any information related to Plaintiff's sale of defendant's product, the customer also had in its possession the new brochure which directed the customer right to defendant's website. All of these elements were well-thought through extremely clearly so that when accounts such as Plaintiff's were closed, all of the dots were connected so that defendant could benefit and profit from Plaintiff's tireless efforts in building a

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

customer base. Plaintiff built that customer base by investing time, energy and money marketing and building a website catering to Swarovski afficionados. By closing its account, defendant wiped out that customer base and robbed it for itself.

A reasonable, objective jury could certainly conclude that defendant's conduct was designed for the purpose of confusing the customer and leading that customer directly to defendant. As stated above, Plaintiff need not show "actual confusion, but whether confusion and deceptions are **likely to occur** ...." (emphasis added). *Bostitch, Inc. v. King Fastener Co.*, 87 *R.I.* 274, 288 (1958). Based on the foregoing, confusion was, indeed, likely to occur. Accordingly, defendant's motion for summary judgment must be denied with respect to Count 5 of the complaint.

**D. Count 3 Of Plaintiff's Complaint Must Survive Summary Judgment Because Genuine Issues Of Material Fact Exist With Regard To, Among Other Things, Whether Defendant's Conduct, As Described Herein, Tortiously Interfered With Plaintiff's Economic Interests.**

The basic elements of interference with prospective economic advantage are: (i) the existence of a business relationship or expectancy; (ii) knowledge by the interferor of the relationship or expectancy; (iii) an intentional act of interference; (iv) proof that the interference caused the harm sustained; and, (v) damages to the plaintiff. *L.A. Ray Realty v. Town Council of Town of Cumberland*, 698 *A.2d* 202, 207 (R.I. 1997).

Elements numbered (i) and (ii) should not be disputed. In the event that the Court denies defendant's summary judgment motion on either Count 2 or Count 5 of

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

Plaintiff's complaint, than material questions of fact exist with respect to elements (iii), (iv) and (v) above. Clearly, if the Court finds that genuine issues of material fact exist with respect to defendant's conduct as it relates to the misrepresentation and unfair competition claims, that same conduct will support a claim for tortious interference with economic advantage.

Accordingly, if the Court denies defendant's motion for summary judgment with respect to either Count 2 and/or Count 5, summary judgment must also be denied with respect to Count 3 of Plaintiff's complaint.

**E. Count 6 Of Plaintiff's Complaint Must Survive Summary Judgment Because Punitive Damages Are Available In The Event The Factfinder Renders A Judgment In Plaintiff's Favor On Either Count 2, 3 Or 5.**

Punitive damages serve to punish the tortfeasor whose wrongful conduct was malicious or intentional and to deter him and others from similar extreme conduct. *Palmisano v. Toth*, 624 *A.2d* 314, 317-18 (R.I.1993). "The standard in Rhode Island for imposing punitive damages is rigorous and will be satisfied only in instances wherein a defendant's conduct requires deterrence and punishment over and above that provided in an award of compensatory damages." *Mark v. Congregation Mishkon Tefiloh*, 745 *A.2d* 777, 779 (R.I.2000). Though punitive damages are considered an extraordinary sanction and are disfavored, they will be permitted if awarded with great caution and within narrow limits. *Palmisano v. Toth*, 624 *A.2d* 314, 318 (R.I. 1993).

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

Plaintiff's claims for misrepresentation, unfair competition and tortious interference with economic advantage all provide for the potential for an award of punitive damages if, as a matter of law, the facts adduced at trial support such an award. As a result, if the Court denies defendant's motion for summary judgment with respect to either Count 2, Count 3 and/or Count 5, than the Court must also deny summary judgment with respect to Count 6 to permit Plaintiff the opportunity to present facts at trial which would support a request for punitive damages.

Accordingly, in anticipation of the Court denying defendant's motion for summary judgment on Counts 2, 3 and/or 5, genuine issues of material fact exist with respect to Plaintiff's claim for punitive damages and, therefore, defendant's motion must be denied with respect to Count 6 of the complaint.

Respectfully submitted,

**PHARMACY SERVICES, INC.**

By Its Attorneys

KLAFTER & MASON, L.L.C.

Gary L. Mason (4835)
Manalapan Corporate Plaza
195 Route 9 South - Suite 204
Manalapan, New Jersey 07726
(732) 358-2028
(732) 358-2029 (fax)

LAW OFFICES OF CAROL A. ZANGARI

Carol A. Zangari (2130)
The Wilcox Building
42 Weybosset Street
Providence, Rhode Island 02903
(401) 831-1999
(401) 454-8309 (fax)

Dated: August 12, 2005

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **PHARMACY SERVICES, INC., t/a ROSELLE CENTER PHARMACY, a/k/a Roselle Center Card, Gift & Collectibles,** | **Case No. 04-72T** |
| **Plaintiff,** | **Civil Action** |
| **vs.** | |
| **SWAROVSKI NORTH AMERICA, LTD., JOHN DOES 1-50 and ABC CORPS. 1-10,** | |
| **Defendants.** | |

**CERTIFICATION OF GARY L. MASON, ESQ. IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**GARY L. MASON, ESQ**., of full age, being duly sworn according to law, upon his oath, certifies as follows:

1. I am an attorney at law of the State of New Jersey. I am a member with the Manalapan, New Jersey law firm Klafter & Mason, L.L.C., counsel to plaintiff in the above-captioned matter. By Order dated July 19, 2004, I was admitted *pro hac vice* for the purpose of representing plaintiff in this matter. I have personal knowledge of the facts set forth herein.

2. Annexed hereto as **Exhibit A** are relevant excerpts from defendant's Mission 3000 document.

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

3. Annexed hereto as **Exhibit B** are documents bate-stamped SNA 620 and 845, representing the increase in defendant's corporately owned galleries from 1999 through 2004.

4. Annexed hereto as **Exhibit C** is the November 26, 2002 e-mail from Danielle Bednarski to Cheryl McFarland, and McFarland's subsequent e-mail to Michael Whitney.

5. Annexed hereto as **Exhibit D** is defendant's most recent version of the Standards For Authorized Swarovski America Limited Retailers.

6. Annexed hereto as **Exhibit E** are relevant portions of defendant's answers to interrogatories.

7. Annexed hereto as **Exhibit F** is defendant's January 15, 2003 letter terminating plaintiff's authorized retailer license.

8. Annexed hereto as **Exhibit G** is the November 13, 2002 e-mail wherein the California-based district sales manager recommends to his regional sales manager that Hermann's Crystal be closed.

9. Annexed hereto as **Exhibit H** is a document bate-stamped SNA 1077 labeled "SDI Procedures, updated 2002."

I hereby certify that the foregoing factual statements made by me are true and accurate to the best of my information, knowledge and belief. I am aware that if any of the foregoing factual statements made by me are wilfully false, I may be

subject to punishment.

Gary L. Mason

Dated: August 12, 2005

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **PHARMACY SERVICES, INC., t/a ROSELLE CENTER PHARMACY, a/k/a Roselle Center Card, Gift & Collectibles,** **Plaintiff,** vs. **SWAROVSKI NORTH AMERICA, LTD., JOHN DOES 1-50 and ABC CORPS. 1-10,** **Defendants.** | **Case No. 04-72T** **Civil Action** |

**CERTIFICATION OF SERVICE**

**GARY L. MASON, ESQ**., of full age, being duly sworn according to law, upon his oath, certifies as follows:

1. On August 12, 2005, I forwarded, via overnight mail, to the Clerk of the United States District Court, District of Rhode Island, One Exchange Terrace, Providence Rhode Island 02903, an original and two (2) copies of:

a. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment;

b. Certification of Gary L. Mason, Esq. in Opposition to Defendant's Motion for Summary Judgment;

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

c. Plaintiff's: (i) Response to Defendant's Statement of Undisputed Material Facts and (ii) Opposing Statement of Material and Disputed Facts; and,

d. This Certification of Service.

2. On August 12, 2005, I forwarded, via overnight mail, copies of the above-referenced documents to:

Michael A. Gamboli, Esq.
Partridge, Snow & Hahn, L.L.P.
180 South Main St.
Providence, RI 02903

Carol A. Zangari, Esq.
42 Weybosset Street
Suite 402
Providence, RI 02903

I hereby certify that the foregoing factual statements made by me are true and accurate to the best of my information, knowledge and belief. I am aware that if any of the foregoing factual statements made by me are wilfully false, I may be subject to punishment.

Gary L. Mason

Dated: August 12, 2005

## The following priorities have been set for 2002:

**1. Develop target distribution (part "I" of the current distribution)**
The most important point for 2002 is to develop the target distribution. Please focus on the following priorities:

Priority 1: SWAROVSKI Retail (SR):

- Implementation / Execution of SWAROVSKI retail plan
- Implementation of New Architecture in all existing concession shops (try to get as much sales space as possible!)
- New openings of concession shops only if we are able to be on the ground floor (main entrance level), with our New Architecture (try to get as much sales space as possible!)
  - ✓ Priority 1: All CGD labels
  - ✓ Priority 2: SF/DSA
- 1 exclusive DS boutique per region is under discussion
- We should generate as many synergies as possible between both off-line and on-line channels

Priority 2: Independent Retail (IR):

- Identify and develop candidates from turnover class 1 (but only A and B quality rating). A possible candidate must meet the target distribution criteria 100%.
- Implement New Architecture and New Displays

Priority 3: Independent Retail (IR):

- Identify and develop candidates from turnover class 2 (but only A and B quality rating). A possible candidate must meet the target distribution criteria 100%.
- Implement New Architecture and New Displays

Due to the fact that Daniel Swarovski is still in the process of developing its business with the aim of establishing the sub-brand solidly in the market an additional distribution agenda is necessary. Please find the details attached in the appendix.

**Chaton Programme for Retail Premium Class:**
Our target is to create a **Premium Retail Class** with "very high standards". A possible candidate must meet 100% of the defined criteria. To make the membership in this Premium Retail Class as attractive as possible, we will launch a "**Chaton programme**" which shall give you the opportunity to offer real "added value" to possible members. Although we are still working on the details of this package together with Marketing Management, some of the advantages will include:

- Preferred independent retailer status in a given sales area.
- Preferred delivery of newly introduced products or products in short supply
- Competent and free shop planning by SWAROVSKI

CONFIDENTIAL

SNA 0632

**Criteria for Independent Retail Premium Class:**

| | |
|---|---|
| What kind of shop are we looking for? | **We are looking for stores, which immediately give our customers the same feeling of image and quality that they get from entering one of our own Swarovski Retail stores. Add to this a high level of traffic and the right brand environment and the fit is perfect.** |

- The retailer shall carry the whole SWAROVSKI world of products (**all CGD labels**) with the actual assortment depth depending upon consumer and shopping profile. The presence of DS Accessories and DS Home Decor is especially dependent upon the right shopping environment.
- Considering the minimum showcase requirements of every label (see appendix), minimum retail space for SWAROVSKI will be **30 m2.** According shop model plans will be presented during regional sales meetings by Communication Department.
- 100% **New SWAROVSKI Architecture**. Shop planning must be done by SWAROVSKI and all planning and installations have to be approved by SWAROVSKI.
- As a result of the upgrading, the store's overall **quality rating must be an "A"** (see New Quality Rating, global rollout within the next 2 months). Please see appendix for further detail.
- As a rule of thumb please keep in mind that the upgrading of outlets only makes sense for both sides (for the independent retailer <u>and</u> for SWAROVSKI), if the candidate has a potential for at least 50'000 € (wholesale, ex VG).

**2. Closure of POP's by the end of 2002 (part "III" of current distribution)**

- Priority 1: Close all C&D outlets
- Priority 2: Close all outlets within turnover classes 5-7
- Priority 3: Close all POP's suspected of involvement in grey market
- Exception: DS Stand Alone's (strategically justified)

We recommend the **closure of these POP's as early as possible** (whenever possible: immediately), in order to free up management capacity to further distribution development. All closures must be effective by 31.12.2002 at the latest. In light of these closures we should look for ways in which to keep the SCS members who are associated with these POP's scheduled to be closed (e.g. personal letter, transfer to SR or other IR).

CONFIDENTIAL

SNA 0633

## *SWAROVSKI RETAIL*

Our own retail distribution achieved excellent results in 2000. It is clear that we are successfully establishing ourselves as a very credible, quality retailer worldwide. The combination of the quality of our product, store design and customer service is significantly increasing our brand awareness and image in all markets. Clear proof of this is the significant increase in year-on-year sales in stores which, at the end of 2000, had been open for more than 2 years. The 20 stores in this category, had a consolidated sales increase of 33% of which 15 had sales increases of over 20%. In the case of concession stores, the total increase of the 54 concessions in this category was 24% of which 33 had increases of over 20%. In addition, the total of 70 stores at the end of 2000 had 16,600 SCS members and the 113 concession stores had 28,800. In the ever changing world of retail, it is imperative that we focus continuously on maintaining our position as a **'superior' retailer**. **To achieve this, we must focus on the 'total customer experience'** The **key 'pillars'** to achieving this relate to the customer and are:

| | |
|---|---|
| *Solutions* | We must ensure that we consider what people really need and how we can meet that need better than competitors |
| *Respect* | Ensure that we train our store managers and sales consultants to provide a courteous, energetic and knowledgeable customer service |
| *Emotions* | We must understand that the retail experience of our customers also goes to the heart, not only the brain |
| *Convenience* | In today's world, time is a precious commodity. We must ensure that we do everything we can to save as much of it as possible for our customers through our efficiency and helpfulness |

**We must ensure that we instil these key pillars into the minds of our retail store personnel.**

## New CGD Distribution Strategy

What does our distribution strategy, "Mission 3000", mean for Swarovski Retail?

The closure of POPs' which do not meet our stringent quality requirements will open up new opportunities for additional Swarovski stores and concessions. We know that through this distribution channel we can achieve excellent sales, significant increase in brand awareness, enhanced brand image and a large database of loyal customers. However, it is crucial that this distribution channel produces the required **profitability**. **We must not replace lost sales with non-profitable sales**.

Our store profile requirements remain the same. The **minimum** store size should be **65 square metres incorporating a minimum store frontage of 5 metres**. We must continue to target 'A' locations which attract high consumer traffic. We must ensure that we are in the neighbourhood of good quality brand retailers, complementary to our profile and product offer.

The location of our stores should not be compromised and whilst our prime objective is to acquire stores which meet our size profile, we will in exceptional cases give careful consideration to stores a little smaller than **65** square metres. However the **store frontage may not be less than 5 metres**.

## Global Retail Standardisation

Our prime goal is to achieve global standardisation throughout our retail distribution. However, it is recognised that certain retail marketing initiatives will be more effectively produced regionally. The following table lays out our plans for 2002. **Please note that regionally produced marketing initiatives must be approved by Central Marketing.**

| | **Global/Central** | **Regional** |
|---|---|---|
| Architecture | Design | Adaptation to local legal standards |
| Visual merchandising | New guidelines to be issued in 2001 with the introduction of the new display props | |
| Special occasions decoration elements | Wedding, Gift Giving, St Valentines Day – Europe/ Asia<br>Mother's Day – Europe/Asia<br>Christmas – Europe | Christmas, Easter, Thanksgiving, Chinese New Year,<br>St Valentines Day - North America<br>Mother's Day - North America<br>etc. |
| In-store advertising | Full set of lightbox posters will automatically be distributed to all stores | |
| External advertising | Advertising sujets provided | Local special advertising sujets |
| New Product | Communication cards and special enhancements/props | |

**Architecture**

Europe/LATAM & Non-VG:

Our store construction program in Europe is progressing very well with Shopex meeting our requirements in terms of quality and timings. It is our intention to continue to work with a bulk quantity of showcases and components so that we should never have to be in a situation where a store opening is delayed due to delays in production.

Asia/Pacific:

This region is now being supplied by Shopex with planning and installation by CDI. A bulk quantity of showcases and components will be maintained by CDI in Singapore to service the entire region.

North America:

The implementation of our 'generation 2' architecture will commence in this region in September 2001. Initially, the retail stores will be produced by Shopex in partnership with Pro Model with the plan to transfer the production totally to Pro Model which is based in the USA.

Current Projects:

We are currently working on new store window designs to create more impact. Prototypes are in production and should be available in the 3rd/4th quarter 2001. In addition, we are continuously working on refinements to the current designs and new presentation elements.

**Flagship Stores**

We are currently developing our 'Flagship' concept for a 1,000 square metre store in the Sony Centre, Potsdamer Platz, Berlin. The project is in its early stage of development – details to follow in due course.

**Swarovski E-Shop**

Swarovski Crystal Online AG and Swarovski Retail are both dealing direct with the end consumer. It is therefore extremely important that we work closely together to ensure that the consumer recognises us as one brand with two retail distribution channels – Off-line and On-line. To this end our E-Shop has been designed to reflect the synergy between the two distribution channels and the respective marketing teams are working closely together to ensure that this synergy is reflected through our respective marketing initiatives.

It is very important that our local retail management and store personnel do not view our E-Shop as a threat. They should see it as part of our endeavour to better serve our customers' needs and wishes as well as make our brand available to new consumers thereby expanding our international brand awareness and image.

[redacted]

## Introduction

For Swarovski, 2001 has been and will continue to be a milestone year for E-Business and E-Commerce:

1. The 13th of June marked the opening of the first Swarovski E-Shops in Europe, with further European E-Shops planned for the end of September and the US E-Shop scheduled for the beginning of October.

2. The end of September marks the relaunch of the current website (www.swarovski.com).

***Clearly Swarovski has, with this initiative, committed itself to a path of 'multi-channel' marketing, sales, communication and customer relations.***

***What does that mean?***

The key to understanding the above lays in understanding the perception of the potential customer or rather the Swarovski strategy behind what the potential customer is intended to perceive:

1. a uniform and consistent picture of Swarovski (CGD)

at all points of contact, be that distribution channels or communication channels i.e. harmonization. For e-business that means harmonizing and implementing CGD CI, style guides, product highlights in offline communication and distribution channels.

2. potential customer choice of points of access to Swarovski

be that distribution channels (sales) or communication channels (information) – the user decides what is most convenient for him. For e-business it means a commitment to communicate offline points of contact (e.g. store finder, CR VG addresses) and vice versa i.e. online points of contact are communicated in all offline distribution and communication channels via the URL www.swarovski.com.

This is the foundation that all e-business content and communication will be based on and e-business will play its part in compounding and promoting the CGD brand.

With this in mind the challenge of e-business will be to use the advantages of online channels:

CONFIDENTIAL



SNA 0657

1. speed - real time potential
2. interactivity
3. access - Swarovski <-> customer

to inform, promote, acquire, romance, captivate, entertain and retain users and customers into the world of Swarovski, be that an online or offline.

## The e-business cycle

E-business marketing will adopt the following interdependent elements as a continuous e-business improvement process:




The objective of the e-business cycle is to achieve increasing:

1. awareness
2. affinity
3. traffic
4. customers
5. sales
6. loyal customers



CONFIDENTIAL
SNA 0658

## Content Management

Content management is the heart and soul of the Swarovski website.

Content Management is the first element in the e-business cycle, it covers all content on the website: text management in 2 languages for the website and 5 languages for the E-shop, image management (including slide shows and films), management of interactive forums and features such as games and competitions. The primary objectives of content management are to inform, promote and interact with the user, but the element of 'fun' and entertainment are going to make the difference between a good and a great online presence – this must be the mid term goal.

There are 2 content management areas and issues for the CGD presence:

1. Content for the website – focusing on information
2. Content for the E-Shop – focusing on sales driven marketing

The Swarovski website is a vehicle for all departments to communicate directly with the user and a great opportunity to feature products (product catalogues and special features), stores (store finder), events (event calendar and features) on the web and in the E-Shops. Additional modules will be added later.

Minimum information requirements for the website and the E-Shop to function are:

1. New product introductions
   – content fact sheets and product shots 12 weeks before live date on the web
2. Events
   – text and photos for upcoming and past events on week before live date on the web
3. Store finder
   - currently the most visited page on the Swarovski website (!)

Clearly the big challenge will be 'in house' information management. Although the basic organizational structures have already been created, we will over the next months be looking to improve information management processes that can facilitate quick and efficient information transfer between the business units, communication, the VGs and e-business. <u>This is change management</u> that requires your support in terms of 'multichannel' acceptance and implementation.



CONFIDENTIAL

SNA 0659

## Communication

Communicating the web: Generating traffic for the website and dollars for the E-Shop.

Communication of the website and the E-Shop is the second element of the e-business cycle. Contrary to popular opinion, websites are rarely found by accident. People need to know you're there! As a result the website and the E-Shop itself will need to be communicated actively as well being an integral part of our communication strategy. The only URL that will be communicated is www.swarovski.com. The E-Shop will also be communicated over this URL.

E-business communication will be the e-business commitment to multichannel marketing and will encompass the following strategies:

1. 'Piggy-backing' - using the existing 'classic' communication channels to promote the website, whereby all communication to potential customers will include the URL www.swarovski.com (from advertisements to events to brochures to packaging to any PR activities). No communication package should reach the potential customer without communicating this URL. Piggy backing will reach a global audience in line with the CGD communication strategy.
2. E-Business specific – an online and offline cross media communication campaign will be launched in October 2001 geared at promoting specifically the website and the E-Shop and the content therein. Included in this package will also be communication material for VGs and the offline distribution channels will be available in October 2001. Initially, this campaign will focus primarily on the European and American markets, in line with E-Shop availability.
3. Other communication – as all communication should highlight the website it is also foreseen, that all business cards, emails and other forms of contact with potential customers are adapted to include the website URL.

E-Business communication will be largely dependant on content in the website as it is clear that a communication of the website in itself will not be sufficient to generate traffic i.e. quick and efficient information from the VGs, business units and communication leads to → informative and entertaining content on the website leads to → creative e-business communication.

## Response management

Learning by looking back

Response management is the 3rd link in the e-business cycle and gauges the success and performance of both the website and the E-Shop by assessing user and customer response and reaction. Response management is intended to provide

feedback resulting in measures to improve both content management and communication initiatives by identifying what works and what doesn't. Tools include:

***Traffic assessment – web tracking***

Online user activity will be monitored and assessed on a regular basis to establish surfing behavior / click flow in the E-Shop and on the website. From this we are able to establish reactions to initiatives in content and communication. All online communication activities are monitored in the same way. Real time!

***E-Shop turnover assessment***

Turnover in the E-Shop is tracked on a daily basis giving us the possibility to track sales performance on article and country level in reaction to any online and offline initiatives

***Customer relations – call center***

It is intended, that emails to customer relations in the VGs and calls to the call centers in Europe and the US are analyzed and evaluated to provide a further basis for improvements in content management, communication and E-Shop services. Currently the European and US call centers track and monitor all calls and emails for the E-Shop. In future all direct contact with customers will be tracked in the same way.

Response management closes the circle back to content management. All feedback will influence the type and style of content on the web and in the e-shop

## Final Word

1. E-Business is an integral part of Swarovski business
2. E-Business is a learning process and requires a change management approach in terms of mind set, information management, process management and organizational structures.
3. E-Business is a real time communication and response tool with the potential to reach and interact with a global audience → <u>use it!</u> → Example: let us know and communicate events in your region → Example: put your POPs in the store finder and let the user find an offline store nearby.
4. The success of e-business within Swarovski depends largely on the mutual willingness and ability of the organization to pro-actively integrate this communication and distribution channel into existing business and communication practices.

April 22, 2003

## NUMBER OF DOORS

| | 1999 | 2000 | 2001 | 2002 | 2003 (as of April 22) |
|---|---|---|---|---|---|
| Department | 1111 | 1142 | 1129 | 1201 | 1246 |
| Independent | 4270 | 4022 | 3215 | 2075 | 2055 |
| SSVL | 7 | 17 | 27 | 43 | 48 |
| *Grand Total* | ***5388*** | ***5181*** | ***4371*** | ***3319*** | ***3349*** |

Door Count Comments:
An active door in 1999, 2000, 2001 = if the door produced sales in that year, then the door was "open".
The active doors in 2002 = active as of 12/3/02.

CONFIDENTIAL
SNA 0845

Lori Beauregard
Ind Dept Door Ct 99_02_KSA SUMMARYUpdated04222003.xls

SNA 0620

## SWAROVSKI GALLERY LISTING

| Store # | Swarovski Gallery Store | Open Date | Address | 2nd Address | City | State | Zip | Phone |
|---|---|---|---|---|---|---|---|---|
| 00 | Company Store | | One Kenney Drive | | CRANSTON | RI | 02920 | 401.463.2928 |
| 01 | Beachwood Place | 11/01/97 | 26300 Cedar Road (Upper Level) | Space 2030 / 2390 | BEACHWOOD | OH | 44122 | 216.292.9737 |
| 02 | The Shops at Prudential Center | 11/15/97 | 800 Boylston Street | Store #167 | BOSTON | MA | 02199 | 617.578.0705 |
| 03 | The Plaza at King of Prussia | 08/01/98 | 160 North Gulph Road | Suite 2373 | KING OF PRUSSIA | PA | 19406 | 610.992.9661 |
| 04 | Bellevue Square | 09/18/98 | 120 Bellevue Square | | BELLEVUE | WA | 98004 | 425.688.8981 |
| 05 | Scottsdale Fashion Square | 10/08/98 | 7014 E. Camelback Road | Space #1264 | SCOTTSDALE | AZ | 85251-1254 | 480.941.1312 |
| 06 | Fashion Centre at Pentagon City | 09/20/99 | 1100 S. Hayes Street | | ARLINGTON | VA | 22202 | 703.418.8665 |
| 08 | The Providence Place Mall | 03/16/00 | 132 Providence Place | | PROVIDENCE | RI | 02903 | 401.270.4350 |
| 09 | Perimeter Mall | 04/11/00 | 4400 Ashford-Dunwoody Road | Space #2357 | ATLANTA | GA | 30346 | 678.441.9191 |
| 10 | Town Center At Boca Raton | 08/11/00 | 6000 Glades Road | Suite 1086 | BOCA RATON | FL | 33431-7219 | 561.447.0088 |
| 11 | Glendale Galleria | 11/10/00 | 2113 Glendale Galleria | | GLENDALE | CA | 91210 | 818.244.9866 |
| 12 | Mall Of America | 10/28/00 | 60 E. Broadway | Space #N-288 | BLOOMINGTON | MN | 55425 | 952.853.2130 |
| 13 | Flatiron Crossing | 09/24/00 | One West Flatiron Circle | Suite 1068 | BROOMFIELD | CO | 80021 | 303.404.2112 |
| 14 | Woodfield Mall | 12/19/00 | Woodfield Mall | Space D-344 | SCHAUMBURG | IL | 60173 | 847.413.9960 |
| 15 | Pioneer Place | 11/22/00 | 700 S.W. 5th Ave | Space #N-2070 | PORTLAND | OR | 97204 | 503.795.7901 |
| 16 | Plaza Las Americas Shopping Center | 09/17/01 | 525 F. D. Roosevelt | Store # 538 | SAN JUAN | PR | 00918 | 787.777.8030- |
| 17 | Aventura Mall | 12/23/00 | 19575 Biscayne Boulevard | Space #1079 | NORTH MIAMI | FL | 33180 | 305.935.2440 |
| 18 | Desert Passage At The Aladdin | 04/21/01 | 3663 Las Vegas Boulevard South | Suite 244 | LAS VEGAS | NV | 89109 | 702.732.7302 |
| 19 | Saint Louis Galleria | 12/16/00 | 2138 Saint Louis Galleria | | ST. LOUIS | MO | 63117-1153 | 314.721.8585 |
| 20 | Westfield Shoppingtown Valley Fair | 07/30/01 | 2855 Stevens Creek Boulevard | Suite #1355 | SANTA CLARA | CA | 95050 | 408.244.6300 |
| 21 | International Plaza | 09/14/01 | 2223 N. West Shore Boulevard | Suite 236-D | TAMPA | FL | 33607-7226 | 813.351.8900 |
| 22 | The Shops at WILLOW BEND | 08/03/01 | 6121 West Park Boulevard | Suite A-123 | PLANO | TX | 75093-6201 | 469.366.9952 |
| 23 | Mohegan Sun | 09/25/01 | One Mohegan Sun Boulevard | Store #C214 | UNCASVILLE | CT | 06382-1355 | 860.862.9200 |
| 24 | The Gardens of the Palm Beaches | 10/15/01 | 3101 PGA Boulevard | Space M-209 | PALM BEACH GARDENS | FL | 33410 | 561.799.9880 |
| 25 | Christiana Mall | 08/24/02 | 507 Christiana Mall Road | | NEWARK | DE | 19702 | 302.737.4811 |
| 26 | Country Club Plaza | 08/24/02 | 427 Nichols Road | | KANSAS CITY | MO | 64112 | 816.756.1511 |
| 27 | Ala Moana Center | 11/24/01 | 1450 Ala Moana Boulevard | Store 3207 | HONOLULU | HI | 96814 | 808.947.3395 |
| 28 | Hollywood & Highland | 11/09/01 | 6801 Hollywood Boulevard | Suite 123 | HOLLYWOOD | CA | 90028 | 323.463.5200 |
| 29 | C/O Garden State Plaza | 09/16/02 | Rts. 4 & 17 | Garden State Plaza | PARAMUS | NJ | 07652 | 201.909.0005 |
| 30 | Westfield Shoppingtown Montgomery | 04/22/03 | 7101 Democracy Boulevard | Space 2404 | BETHESDA | MD | 20817 | 301.365.7900 |
| 31 | Willowbrook Mall | 02/09/02 | 1120 Willowbrook Mall | | WAYNE | NJ | 07470 | 973.812.7500 |
| 32 | Madison Avenue | 12/20/01 | 625 Madison Avenue | | NEW YORK | NY | 10022 | 212.308.1710 |
| 33 | San Francisco Shopping Centre | 07/03/02 | 865 Market Street | Space # 164 | SAN FRANCISCO | CA | 94103 | 415.974.5800 |
| 34 | Fashion Show Mall | 12/20/02 | 3200 Las Vegas Boulevard South | Space #2810 | LAS VEGAS | NV | 89109 | 702.732.8161 |
| 35 | Village of Merrick Park | 09/27/02 | 370 San Lorenzo Avenue | 2422 Village of Merrick Park | CORAL GABLES | FL | 33146 | 305.448.1952 |
| 36 | Roosevelt Field Mall | 04/27/02 | 630 Old Country Road | Store #1103A | GARDEN CITY | NY | 11530 | 516.248.6155 |
| 37 | The Streets at Southpoint | 03/08/02 | 6910 Fayetteville Road | Suite 260 | DURHAM | NC | 27713 | 919.484.9979 |
| 38 | NorthPark Center | 05/18/02 | 510 NorthPark Center | | DALLAS | TX | 75225 | 214.739.9124 |
| 39 | Pittsburgh International Airport | 05/25/02 | C/O Genco Central Receiving Bldg | Pittsburgh Int'l Airport | PITTSBURGH | PA | 15231 | 412.472.1030 |
| 40 | Danbury Fair Mall | 11/11/02 | 7 Backus Avenue | P.O. Box 393 | DANBURY | CT | 06810 | 203.744.2002 |
| 41 | The Somerset Collection, North | 09/07/02 | 2800 West Big Beaver Road | Suite # U223 | TROY | MI | 48084 | 248.458.0628 |
| 42 | Ross Park Mall | 11/08/02 | 1000 Ross Park Mall Drive | | PITTSBURGH | PA | 15237 | 412.366.2881 |
| 43 | Polaris Fashion Place | 11/29/02 | 1500 Polaris Parkway | Space #2208 | COLUMBUS | OH | 43240 | 614.847.4460 |
| 44 | Memorial City Mall | 11/29/02 | 900 Gessner | Suite 702 | HOUSTON | TX | 77024 | 713.932.8880 |
| 45 | Freehold Raceway Mall | 04/05/03 | 3710 Route 9 | #F110 | FREEHOLD | NJ | 07728 | 732.625.7770 |
| 46 | La Plaza | 04/05/03 | 2200 South 10th Street | Space #Q13B | McALLEN | TX | 78503 | 956.661.9393 |
| 47 | Tysons Corner Center | 05/03/03 | 8017 Tysons Corner Center | | McLEAN | VA | 22102 | 571.633.1800 |
| 48 | Southpark, Charlotte | 07/03/03 | 4400 Sharon Road | Space L-2 | CHARLOTTE | NC | 28211 | 704.366.8131 |
| 49 | Westfield Shoppingtown Old Orchard | 06/28/03 | 29 Old Orchard Center | Suite 29A | SKOKIE | IL | 60077 | 847.679.8670 |
| 50 | Smith Haven Mall | 06/05/04 | 313 Smith Haven Mall | Space E-16 | LAKE GROVE | NY | 11755 | 631.979.2392 |
| 51 | Woodbury Commons | 08/04/03 | 839 Grapevine Court | | CENTRAL VALLEY | NY | 10917 | 845.928.1003 |
| 52 | Arden Fair | 08/27/03 | 1689 Arden Way | Space 1092 Lower Level | SACRAMENTO | CA | 95815 | 916.646.6044 |
| 53 | Broadway Plaza | 09/22/03 | 1196 Broadway Plaza | Space #D30 | WALNUT CREEK | CA | 94596 | 925.274.9200 |
| 54 | The Millenia Mall | 10/18/02 | 4200 Conroy Road | Suite 141 | ORLANDO | FL | 32839 | 407.370.3380 |
| 55 | Oakbrook Mall | 03/27/04 | Oakbrook Center | 104 Oakbrook Center | OAKBROOK | IL | 60523 | 630.586.8586 |
| 56 | The Quarter at Tropicana Casino & Resort | 09/30/04 | 2801 Pacific Avenue | Suite # 214 | ATLANTIC CITY | NJ | 08401 | |
| 57 | Wrentham Village Premium Outlets | 05/07/04 | One Premium Outlets Boulevard | Suite #537, Bldg E | WRENTHAM | MA | 02093 | 508.384.0516 |
| 58 | Chicago Premium Outlets | 05/19/04 | 1650 Premium Outlets Boulevard | #1137 | AURORA | IL | 60504 | 630.499.9569 |
| 59 | Burlington Mall | 08/13/04 | 75 Middlesex Turnpike | Space #1006 | BURLINGTON | MA | 01803 | 781.221.1437 |
| 60 | Westfield Farms Mall | 10/-/2004 | 500 West Farms Mall | Space #C-235 | FARMINGTON | CT | 06032 | |
| 61 | Fashion Square | 08/27/04 | 14006 Riverside Drive | Space #261 | SHERMAN OAKS | CA | 91423 | 818.995.6730 |
| 62 | Century City | 10/-/2004 | 10250 Santa Monica Boulevard | Space #107 | LOS ANGELES | CA | 90067 | |

RETAIL_STORES_SWAROVSKI GALLERY LISTING (MAE)
REVISED: 08/16/04

**Whitney Mike**

**From:** McFarland Cheryl
**Sent:** Tuesday, November 26, 2002 2:35 PM
**To:** Whitney Mike
**Cc:** Bednarski Danielle
**Subject:** FW: Roselle Center Card, Gift & CO

**Importance:** High

Mike,

I concur with Danielle's assessment of this account. Based on our visual standards, we would not open them today. This store does not meet our philosophy of "total excellence" as outlined in the Standards for Authorized...Retailers. This account does not offer prestige merchandise. It is an active pharmacy that has grown to include a card and gift business. There is a direct line of sight from our product to cards and giftwrap. The mix of product includes low end to lower moderate gifts and collectibles. In addition, the pharmacy and card/gift stores share a common entrance. The entry vestibule is glass, with doors on either end, the left leading into the pharmacy, and the right leading into the card store. There is no physical barrier between the divergent businesses. When I visited this store with Danielle earlier this year, I was concerned by the worn appearance of the shopping plaza and the store itself.

The owner is interested in opening an upscale giftware store in Freehold in 2003. I advised that he would have to submit the usual materials to be considered for approval (i.e., architectural renderings, photographs, list of approved lines they'll be carrying, etc.).

I am recommending that we close this account.

Sincerely,
Cheryl

**Cheryl McFarland**
**Regional Sales Manager**
**Swarovski North America, Ltd.**
**405 Orchard Avenue**
**Pittsburgh, PA 15202**
**Voice Mail: 800-289-4900 X6636**
**Phone: 412-761-7698**
**Fax: 412-761-7699**
**Cheryl.McFarland@Swarovski.com**

-----Original Message-----
**From:** Bednarski Danielle
**Sent:** Tuesday, November 26, 2002 2:00 PM
**To:** McFarland Cheryl
**Subject:** Roselle Center Card, Gift & CO

Dear Cheryl,

One of my accounts is Roselle Center Card ,Gift & Co. account number 3001784. I am recommending this account be closed due to the environment of the store. This store dosn't enhance our product image. A little history about the account: they are located in a strip mall along with a Foodtown grocery store and a pizza restaurant. When you walk in the door of the store to your left is a full Pharmacy and to your right is a card, gift and collectible store. There is not a separate entrance to both. The rear of the store also carries Lotto and magazines. They currently carry SC, SJ, and two towers of CM. The atmosphere of the account and the lines carried don't enhance are product. They carry inexpensive gift items and the Pharmacy doesn't help either. The store information is:

Roselle Center Card, Gift & Collectibles
570 Raritan Road
Roselle, NJ 07203

SWAROVSKI

**STANDARDS FOR AUTHORIZED**
**SWAROVSKI NORTH AMERICA LIMITED RETAILERS**

Swarovski North America Limited ("SNAL") will sell its products only to Authorized Retailers that meet the minimum standards set forth below. Meeting these standards, however, does not guarantee selection or retention as an SNAL Authorized Retailer.

The SNAL Philosophy: SNAL distributes the premier brand of faceted, full-lead crystal objects and premier jewelry products. SNAL products incorporate superior design and excellence in materials in craftsmanship, and are regarded as an artistic product evolved from generations of thought and experience. Therefore, SNAL products must be displayed in a manner consistent with the quality, workmanship and design expressed in the product, as well as the prestigious, premier position it enjoys in the marketplace. This philosophy of total excellence is a discipline that extends to the types and appearance of stores and displays through which SNAL products are sold, the appearance, attitude and training of sales personnel, and the advertising and other methods used to market SNAL products.

Product Selection and Display: The SNAL Philosophy requires a represented selection of SNAL products displayed so as to promote the SNAL trademarks, prestige and image, and to prevent confusion of any other manufacturer's product with SNAL products. SNAL authorized retailers shall at all times:

1. display an appropriate representation from each authorized product category throughout the year; and

2. display SNAL products separately from all other products, and in a prominent and attractive manner, using an SNAL floor stand display(s) and utilizing other display materials SNAL supplies, unless these requirements are waived in writing by SNAL; and

3. maintain all displayed SNAL products in a clean, uncluttered and undamaged condition, consistent with the promotion of the SNAL Philosophy; and

4. train sales personnel to be informed and knowledgeable regarding SNAL products, and to be attentive, helpful and courteous to customers at all times, and must employ only sales personnel that are otherwise capable of promoting the SNAL Philosophy; and

5. purchase a sufficient volume of SNAL products to justify SNAL's commitment to and support of the Retailer. Sufficient volume may vary depending on the Retailer's location, credit history, purchasing practices, quality of business, and other circumstances SNAL may in its sole discretion deem relevant but generally is:

   A. Giftware:

      1. $15,000 for a multi-line Swarovski account

   B. Jewelry:

      1. $2,000 for a Swarovski jewelry only account

SNAL Authorized Retailers: SNAL Authorized Retailers must offer prestige merchandise and supportive merchandising and marketing practices, have a reputation for carrying fine branded products, and otherwise be capable of promoting the SNAL Philosophy. Authorized Retailers typically include fine gift stores, fine collectible shops and fine jewelry stores or other retailers who meet these standards. Integral to the SNAL Philosophy is the requirement that Authorized Retailers sell the product predominantly through traditional retail marketing. SNAL products will be sold only by finer retailers capable of promoting the SNAL Philosophy. Authorized Retailers must remain in good credit standing with SNAL and must not be insolvent. All retail premises shall be constructed. designed, decorated and maintained in a manner consistent with the finest gift, collectible, jewelry and accessory retail stores.

Advertising and Other Marketing Methods: The SNAL Philosophy requires that advertising and other marketing methods promote the SNAL products, trademarks, reputation and image. Authorized Retailers must market in a manner that enhances SNAL's ability to review Authorized Retailers' practices, and must maintain accurate records concerning sales of SNAL's products to ensure their adherence to these standards. To promote these goals, Authorized Retailers:

1. shall not advertise or market in a manner inconsistent with the SNAL Philosophy, including advertising that emphasizes discount pricing (in-store or otherwise), compares to regular prices, refers to savings, communicates sensationalism or no-frills products, or confuses or misleads customers; and

2. shall submit any print, audio or visual advertising efforts relating to SNAL merchandise to SNAL's Vice President of Marketing for approval; and

3. shall sell all SNAL products at retail and only on the Authorized Retailer Premises; and

**Standards for SNAL Retailers (continued)**

4. shall not ship to any other retailer, except with written permission of SNAL; and

5. shall not mislead customers concerning prices, services or any other aspect of SNAL's products and shall not confuse any other manufacturer's product with SNAL products; and

6. shall charge prices adequate to cover the premier marketing services consistent with the SNAL Philosophy as expressed in these standards.

Suggested Retail Price List: SNAL provides a suggested Retail Price List to its Authorized Retailers.

Review of Authorized Retailer's Performance and Practices: SNAL conducts periodic independent reviews of its Authorized Retailer's compliance with these Standards and of their efforts to promote the SNAL Philosophy. SNAL's actions concerning its Authorized Retailers are undertaken unilaterally, and not at the request of other Authorized Retailers. SNAL therefore does not need or solicit, and requests that Authorized Retailers not provide information concerning other Authorized Retailers' pricing, marketing or other trade practices.

Terms and Conditions of Sale: All sales of SNAL products are subject to SNAL's Terms and Conditions of Sales ("Terms"), as they may be supplemented or amended from time to time. Copies have been provided to all Authorized Retailers, additional copies are available upon request to the Vice President of Sales, One Kenney Drive, Cranston, Rhode Island 02920.

General Standards and Policies: Termination of Authorized Status: Nothing in the Authorized Retailers' Standards, or in SNAL's approval or disapproval of a retailer as an Authorized Retailer, creates a contract or any binding obligation on SNAL or any Authorized Retailer. SNAL reserves its rights to terminate the Authorized Retailer in its sole and absolute discretion and to sell to or refuse to sell to any Authorized Retailer, at any time without notice for any reason or no reason. Failure to comply with any of these Standards may result in SNAL's unilateral termination without notice of Authorized Retailer status, and cancellation of pending orders for all SNAL products. All compliance, termination, selection and authorization decisions are in SNAL's sole, complete and unilateral discretion. Any failure to act or waiver by SNAL of any of its rights concerning any Retailer, regardless of the duration of SNAL's inaction or waiver and regardless of SNAL's intent, shall not prevent or impair SNAL's later exercise of its rights. Authorized Retailer status may not be sold, conveyed, assigned or otherwise transferred to anyone, or any other location, including any new owner, new address or new business.

The undersigned has:

1. received and read the Standards for Authorized Swarovski North America Limited ("SNAL") Retailers, and meets or exceeds those standards; and

2. received and read Swarovski North America Limited's Terms and Conditions of Sales ("Terms") and agrees that all sales of products by Swarovski North America Limited are made pursuant to and governed by those Terms, as they many be supplemented or amended from time to time in SNAL's sole discretion.

Approval as an Authorized SNAL Retailer is in SNAL's absolute and sole discretion. SNAL's Terms and Conditions of Sale may be supplemented or amended at any time, and the undersigned agrees that SNAL sales will also be made pursuant to and governed by such supplemental or amended Terms. SNAL also may supplement or amend its Standards at any time without notice. The "Authorized" status of an Authorized SNAL Retailer shall automatically terminate without notice if SNAL determines in its sole discretion either that the Retailer is no longer qualified to be a SNAL Retailer, or that the Retailer fails to meet any of the Standards, as they may be supplemented or amended from time to time.

Business Name: ______________________________

Address: ______________________________

______________________________

Name of President/Owner: ______________________________

Signature of (President) individually: ______________________________

Date: ______________________________

C:\TEMP\Standards for Authorized Retailers.doc

**INTERROGATORY NO. 4:** Set forth, in detail, all conversations and communications between the parties to this action, their agents, employees, servants, representatives, officers, directors or partners concerning any of the claims asserted in this lawsuit or any of the facts alleged in Plaintiff's complaint, indicating:

a. The date and place of each conversation;

b. The parties to each conversation; and

c. The substance of each conversation.

**ANSWER:** SNA does not believe that the parties had any conversations concerning the termination of plaintiff's account. SNA is constantly evaluating stores and opens and closes many stores every year for various reasons. In 2002, SNA was well into the implementation of Mission 3000, which involved closing a large volume of accounts that were not seen as enhancing or supporting the premium-brand positioning the company wanted. SNA closed certain retail locations with unacceptable sales volume (less than $10,000 - $15,000), stores that carried only one line of product such as Crystal Moments, and stores whose door rating (overall appearance) was deemed unacceptable. There were 4,270 active independent retailers in 1999. As of the end of 2002, there were 2,075 such retailers. After visiting the plaintiff's store together in or about August of 2002, Cheryl McFarland and Danielle Bednarski decided that plaintiff's store did not enhance the SNA brand due to its appearance, location and other factors set forth in November 26, 2002 e-mails from Ms. Bednarski to Ms. McFarland and Ms. McFarland to Mr. Whitney. Mr. Whitney and Paul Morton decided to close the Roselle Account. The decision was likely made in late November, however an account is not often terminated until the credit department had been notified and has had an opportunity to have the clients' receivables paid to a satisfactory level. It is assumed that the credit department approved the closing of plaintiff's in early January, 2003, because the termination letter addressed to the plaintiff is dated January 15, 2003. This letter was the only notification provided to plaintiff concerning plaintiff's termination. SNA did not contact plaintiff to discuss plaintiff's termination or otherwise respond to plaintiff's inquiries about its termination. Plaintiff is also referred to documents being produced in response to Requests No. 1-4 of Plaintiff's First Request for Production of Documents, which include communications between the parties.

SWAROVSKI

January 15, 2003

**VIA CERTIFIED MAIL**
**RETURN SERVICE REQUESTED**

ROSELLE CENTER CARD, GIFT & COLLECT
570 RARITAN RD
ROSELLE, NJ 07203-2446

Account Number: 3001784

Dear Owner/Retailer:

Swarovski North America Limited reviews its business relationship with its retailers periodically. As a result of such an internal review, the business relationship between our two companies is regretfully ended. Your status as an Authorized Retailer is terminated with this letter.

This change of status will not prevent us from shipping any orders you may have placed. We will ship all of your unshipped orders for Swarovski North America Limited merchandise on a cash-in-advance or credit card basis. We will, however, not accept future orders from you, including SCS orders. Should you wish to receive your pending orders, please contact our Credit Department at (800) 289-4900 *6500 to arrange for payment. If such arrangements are not made within ten (10) days of the date of this letter, we will assume you are no longer interested in those unshipped orders and will cancel them.

By this letter, we are also notifying you that your company's lease(s) for Swarovski display case(s)

DW3254 DS1505 DS1467 DS1466 DG1391

are also terminated effective the date of this letter. To provide time for sell-down of existing stock, our Visual Merchandising Department will contact you approximately ninety (90) days from the date of this letter to schedule a date for retrieval of the case(s). After this period, you must cease use of all Swarovski merchandising materials (including but not limited to point of purchase displays, signage, stands, brochures and printed advertising), as well as all use of the "Swarovski" mark, the Swarovski swan logo, any other marks owned by Swarovski (such as "Crystal Memories" and "Silver Crystal"), and permanently refrain from using any marks or names confusingly similar and those owned by Swarovski. If you would like your cases picked up at an earlier date, please contact the Visual Merchandising Department.

Swarovski North America Limited made the decision to terminate your Authorized Retailer status only after an extensive review of your business relationship by all levels of sales management. This decision is conclusive. Should you have concerns regarding the termination of our business relationship that are not addressed in this letter, you may contact our inquiry line here in our Cranston offices by leaving a message at (401) 463-2638. You will receive a written response within 10 business days.

We wish you the best in your enterprise.

Sincerely,

SWAROVSKI NORTH AMERICA LIMITED

Paul W. Morton
Vice President of Sales

PWM/lab

SNA 0001

> From: Clark James
> Sent: Wednesday, November 13, 2002 1:04 PM
> To: Whitney Mike
> Subject: FW: Hermanns Crystal account # 3002045 Account Update
> Importance: High
>
> Mike:
>
> Based on this e-mail from Rebecca Olodort, I recommend that
Hermanns
> Crystal be removed from our active account list.
>
> Regards, Jim Clark
>
> -----Original Message-----
> From: Olodort Rebecca
> Sent: Wednesday, November 13, 2002 10:15 AM
> To: Clark James
> Subject: Hermanns Crystal account # 3002045 Account Update
> Importance: High
>
> Jim:
>
> Hermanns Crystal is located in a shopping area that is run down, has
no
> traffic with a 50+% rate of shop vacancy. The only time the area has
> trade is during the Oktoberfest celebration, which occurs once a year.

>
> The interior of the store is run down and soiled. The store needs new
> paint, carpet and fixturing throughout.
>
> Hermanns Crystal has a low probability for improvement in the above
> mentioned areas.
>
>
> Best regards,
>
>
> Rebecca
>
>
> Rebecca Fryer Olodort

*SDI Procedures*
*Updated 2002*

1. Sales Analysis reports on accounts performing below benchmark by label, National Accounts are not included.
    a. Management review size and impact of closures prior to send to the field.
    b. Account must be in business with Swarovski North America for at least 2 years, however special circumstances may arise and the 2-year rule may be overridden.
        i. Criteria of latest closure:
            1. All Crystal Moments only accounts
            2. All Jewelry only accounts under $5,000 wholesale
            3. SC and SCS accounts doing less then $10,000 wholesale
            4. All multi-line accounts doing less then $15,000 wholesale
            5. All accounts most have been open for at least one year
2. Sales Analysis sends the list of accounts that are performing below benchmark to the field for review and comments.
3. Once the field reviews the list, sales management reviews and advises on final changes.
4. Materials and supplies are ordered.
5. SDI listing gets sent to Credit for review
    a. Credit will advise on any accounts with credit problems
        i. Credit problem accounts- will not get letter and account will not be closed till A/R balance is paid off.
6. SDI listing is sent to Customer Service for review and a open order report on SDI accounts.
7. Once Credit review and advises; the SDI final listing gets sent to IT for de-authorizations and account closure.
8. Final listing gets sent to Credit, Customer Service and the Visual Merchandising department for department notification.
9. Letter coordination – (Temp comes in for printing out letters, stuffing letters, and filling out certified green cards).
10. Final notification is sent in the newsletter to the field along with the final SDI listing.
11. Executive Assistant for the VP of Sales handles the SDI mailbox. The mailbox accepts calls from accounts, which is reviewed by the VP of Sales.