KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **PHARMACY SERVICES, INC., t/a ROSELLE CENTER PHARMACY, a/k/a Roselle Center Card, Gift & Collectibles,** | : | **Case No. 04-72T** |
| **Plaintiff,** | : | **Civil Action** |
| **vs.** | : | |
| **SWAROVSKI NORTH AMERICA, LTD., JOHN DOES 1-50 and ABC CORPS. 1-10,** | : | |
| **Defendants.** | : | |

**PLAINTIFF'S: (i) RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND (ii) OPPOSING STATEMENT OF MATERIAL AND DISPUTED FACTS**

A. Plaintiff's Responses To Defendant's Statement Of Undisputed Material Facts.

1 - 8. Admitted.

9. Denied. Plaintiff submits that this statement mis-characterizes testimony. Indeed, at times, defendant has developed certain programs to eliminate authorized retailers; however, those programs rarely, if ever, were fully implemented. *See Plaintiff's Opposing Statement of Material Facts, infra.*

10. Denied. A review of the Mission 3000 document, *relevant portions of which are annexed as Exhibit A to the Certification of Gary L. Mason, Esq. ("Mason Cert.")* submitted herewith, reveals that a large aspect of Mission 3000 was targeted on internet sales, whereas prior initiatives focused on an authorized retailer's annual gross revenue. *See Plaintiff's Opposing Statement of Material Facts, infra.*

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

11. Denied. This statement is simply internally inconsistent with the testimony of Paul W. Morton ("Morton"), defendant's former Vice President of Sales. *See Plaintiff's Opposing Statement of Material Facts, infra.*

12 - 17. Admitted.

18. Plaintiff can neither admit nor deny these statements because plaintiff was not a party to the same. However, as stated *infra*, at no time did either Cheryl McFarland ("McFarland") or Danielle Bednarski ("Bednarski") discuss any of these items with plaintiff or advise plaintiff that potential issues existed with its business. Further, plaintiff questions whether or not these conversations took place. Notwithstanding the testimony of McFarland and Bednarski, both of whom are current employee of defendant, there is absolutely no documentation whatsoever related to these discussions or the decisions made as a result of these discussions. At a bare minimum, one would expect to see a memorandum or electronic mail confirming these discussions, especially when those discussions were going to lead to the termination of plaintiff's authorized retailer status.

19. See response to ¶18, *supra.*

20. Admitted; however, plaintiff points out the following, discussed in more detail *infra*. Michael Whitney ("Whitney"), defendant's former National Sales Manager, also testified that defendant had no prohibition against discounting on the internet. Further, plaintiff sold numerous premium brands of gifts, including but not limited to Lladro, Hummel, Waterford, Lenox and Armani. Indeed, according to Morton's testimony, discussed in more detail *infra*, defendant made a concerted effort to mix lower priced product lines with higher end products for a different type of presentation in middle market

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

distribution. Therefore, the alleged premise for Whitney's communication with McFarland regarding plaintiff's business does not sense.

21 - 22. Admitted.

23. Plaintiff admits the second sentence but denies the first sentence of this paragraph. There is absolutely no testimony or other evidence suggesting that Morton was in any way involved in the decision to terminate plaintiff's authorized retailer status.

24 - 25 Admitted.

B. Plaintiff's Opposing Statement Of Material and Disputed Facts.

1. In October 1999, plaintiff became an authorized retailer of defendant's product.

2. Plaintiff's ability to sell defendant's product resulted in an increased customer base.

3. Specifically, plaintiff observed that many Swarovski crystal afficionados regularly collect defendant's product and, as a result, when plaintiff became an authorized retailer, these customers became Swarovski purchasers and, consequently, potential regular customers of plaintiff's gift and collectible business.

4. During 2000, plaintiff launched its own website, www.giftandcollectibles.com, which advertised much of plaintiff's full line of product, including defendant's product.

5. Plaintiff's website was routinely updated with newly released product as defendant, through its sales force, would announce to plaintiff and other authorized retailers.

6. Plaintiff's website triggered a dramatic increase in sales from $60,000.00 in 2001, to over $250,000.00 in 2002 **in just defendant's product**.

7. Plaintiff attributes the dramatic increase in sales for defendant's product, in part, to its diverse product offering, and to its competitive pricing, specifically, plaintiff's ability to discount twenty percent (20%).

8. During 2002, plaintiff bought approximately $163,000.00 in merchandise, wholesale, from defendant, and signed up approximately ninety-five (95) consumers for the Swarovski Crystal Society ("SCS"), discussed below.

9. Until September 2003 when he was terminated, Morton was defendant's Vice President of Sales. *April 11, 2005 deposition of Paul W. Morton at 6:6-10.*

10. According to Morton, what prompted Whitney to contact McFarland about plaintiff's business was his recollection that, at some point in the past, plaintiff had been ranked a 2 in the context of one of defendant's rating schematics, not because of plaintiff's pricing strategies or product line. *Morton Dep. at at 14:18 - 15:21.* Morton's testimony and Whitney's testimony is clearly internally inconsistent.

11. In the early 1990's, defendant initiated a program called Distribution Improvement Program, which then became Strategic Distribution Improvement which later became Mission 3000. Defendant made it a practice to review its customer base and close "low volume retailers." *Morton Dep. at 34:13-19.* Mission 3000 took distribution improvement to a new level in that defendant planned to reduce its approximate 18,000 worldwide doors to 3,000 doors. *Id. at 36:20 - 37:3.* The purpose of Mission 3000 was "to have a retail distribution that focused on the customers ...." *Id. at 37:19-21.*

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

12. The Mission 3000 concept began in or around 1998. *Morton Dep. at 38:2-10; 42:3-2.* Mission 3000 made selling defendant's product on-line and off-line through defendant's corporately owned galleries the number one priority. *Mason Cert. Exhibit A at SNA 632.* Further, Mission 3000 specifically indicated defendant's need to maintain the SCS members after they had closed independent retailers. *Id. at SNA 633.* Mission 3000 included an entire section on defendant's focus in opening more of its corporately owned galleries. *Id. at SNA 642-646.* Mission 3000 also focused on defendant's e-business and selling direct to consumers via defendant's revamped website. *Id. at SNA 657-661.*

13. Defendant made a concerted effort to mix lower priced product lines with higher end products for a different type of presentation in middle market distribution to re-build and replace volume that had been lost with prior closures. *Morton Dep. at 41:1-6.* As discussed below, this testimony is directly inconsistent with that of Whitney with respect to the impetus for communicating with McFarland regarding plaintiff's business.

14. As early as 1994, defendant had decided to begin opening its own corporate stores. *Morton Dep. at 46:20 - 47:1.* Defendant's first two (2) stores opened in 1997 in Cleveland, Ohio and Boston, Massachusetts. *Id. at 47:5-10.* Opening its own dedicated corporate stores had always been a long-term strategy. *Id. at 47:14-22.* Indeed, in 1999, defendant had 7 galleries, in 2000 defendant had 17 galleries, in 2001 defendant had 27 galleries, in 2002 defendant had 43 galleries, in 2003 defendant had 52 galleries, and by October 2004 defendant had 62 corporate owned galleries. *Mason Cert. Exhibit B.*

15. Morton and Whitney would typically sit together and make the final decision regarding whether or not to terminate an authorized retailer's license. *Morton Dep.*

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

*at 54:10-14.* The record is void of any testimony, documents or other evidence indicating that Morton and Whitney ever discussed whether or not to terminate plaintiff's authorized retailer license.

16. There was no requirement that the initial recommendation to terminate an authorized retailer's license come first from the district sales manager. Rather, that recommendation could just as easily come from the regional sales manager or directly from the national sales manager. *Morton Dep. at 57:15 - 58:3.* Therefore, McFarland's instructions to Bednarski that Bednarski prepare the initial memorandum recommending the termination of plaintiff's authorized retailer license was never necessary and, therefore, suspicious.

17. In determining whether or not to terminate an authorized retailer's license, the district sales managers were guided by the standards set forth in the Standards For Authorized Swarovski America Limited Retailers (the "Standards"), *annexed as Exhibit B to the Affidavit of Douglas Brown ("Brown Aff."); see also Morton Dep. at 59:14 - 60:19.* It was expected that the district sales managers would rely on the Standards and the rating codes in communicating with the regional sales manager regarding the reasons for terminating a particular retail license. *Id. at 66:6-11.* The record is void of any testimony, documents or other evidence suggesting that plaintiff had violated or acted inconsistently with any of the Standards. Moreover, from the time that plaintiff was approved as an authorized retailer in October 1999 through the date on which its authorized retailer status was terminated, the Standards have never changed.

18. In the event that there were fixable issues relating to the ambiance of a

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

store, the adjacencies of merchandise, advertising, merchandising of products, the district manager would first try to convince the retailer to address and correct those matters. *Morton Dep. at 62:9-16.* At no time was plaintiff ever given the opportunity to correct what either McFarland or Bednarski allegedly believed was deficient about plaintiff's store. Indeed, neither defendant nor any employee of defendant EVER discussed with or disclosed to plaintiff the reasons for its termination.

19. It was expected that a district sales manager's conclusion that, for example, a particular retailer's operations do not enhance defendant's image would prompt follow-up discussion regarding the details supporting the district sales manager's conclusions, who would be expected to provide certain facts to support that conclusion. *Morton Dep. at 66:17 - 67:20.* This never happened in plaintiff's case. Rather, Bednarski's e-mail to McFarland, *annexed as Exhibit C to the Mason Cert.*, which she was ordered to prepare by McFarland, did not, by any stretch of the imagination, conform with what Morton testified should be the expected procedure when terminating a license.

20. Dan Cohen, defendant's president, was not involved in the decision to terminate plaintiff's authorized retailer license, and no one sought his authorization respecting the same. *Morton Dep. at 73:5-13.* The Standards, *annexed as Exhibit B to the Brown Aff.*, state at the "General Standards and Policies" section, that "[a]ll compliance, termination, selection and authorization decisions are in SAL's sole, complete and unilateral discretion, and **<u>must be made by SAL's President</u>**" (emphasis added). Interestingly, defendant's most recent version of the Standards, *annexed as Exhibit D to the Mason Cert.*, prepared after plaintiff's closure eliminates this requirement.

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

21. Defendant had a limited number of training sessions that were all-day seminars to which "key retailers" in a market were invited. Defendant had an "upper limit" on attendance because these were participatory training sessions as opposed to lectures. Ideally, defendant did not want more than twenty-five (25) people at a session. Therefore, not every retailer was invited. Rather, the "most important retailers" were invited to these training sessions. *Morton Dep. at 74:1 - 76:18.* Plaintiff was one (1) of the retailers specially invited to participate in the October 2002 training session. *April 11, 2005 deposition of Stuart Schulman at 59:14-17.*

22. Paul Bono ("Bono") has been employed by defendant as a regional sales manager for approximately fifteen (15) years. *April 13, 2005 deposition of Paul Bono at 4:9-14.*

23. At various times throughout Bono's employment with defendant, Central New Jersey was included within his territory. *Bono Dep. at 5:25 - 8:2.*

24. Communication between the regional sales manager and the district sales managers is very important and should occur, in one form or another, between 2-3 times per week. *Bono Dep. at 9:17 - 10:3. See also April 12, 2005 deposition of Danielle Bednarski at 20:17 - 21:5.*

25. Bono has never terminated one of his accounts because the retailer "did not enhance" defendant's image. In fact, Bono has serviced and continues to service accounts that sell gift cards, lottery tickets and are located in strip malls, some of the items which allegedly supported defendant's decision to terminate plaintiff's authorized retailer license. *Bono Dep. at 12:11 - 13:19.*

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

26. Bono confirmed that defendant has no policy or procedure that would require a district sales manager to first make the recommendation to close a particular account before being delivered to Whitney, *Bono Dep. at 16:18-22; 17:7-9*, which again calls into question McFarland's motives in requiring Bednarski to first e-mail her recommending the termination of plaintiff's authorized retailer license, making it appear as though it was Bednarski's independent decision when, in fact, it was Whitney and McFarland who pushed for the termination.

27. McFarland claims that she and Bednarski made the decision to terminate plaintiff's authorized retailer license in August 2002 when they visited plaintiff's business. Yet, when Bono visited plaintiff's business in January/February 2001, he did not believe that the business detracted from defendant's image. *Bono Dep. at 27:15 - 28:1.* Absolutely no changes were made to plaintiff's business during the time that it was an authorized retailer. *Schulman Dep. at 51:19-22.*

28. Bono has never recommended the termination of an authorized retailer's license because of that retailer's non-compliance with the Standards. Rather, "a lot of things took care of themselves with low volume, benign neglect of accounts" and accounts self-imploding. *Bono Dep. at 29:13-19.*

29. During the course of the parties' business relationship, defendant routinely encouraged plaintiff to convince as many customers as possible to join the SCS, a group created for those with a particular interest in crystal. Defendant's retailers are encouraged to solicit their customers for the SCS. Further, regional sales managers encourage their district sales managers to promote SCS with their accounts because "they

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

become like an annuity that keeps paying." "It's how [defendant] gets them back into the store ...." *Bono Dep. at 31:2-20; see also Bednarski Dep. at 15:2 - 16:20.* Defendant directly corresponds with SCS members signed up by the authorized retailers. *Bono Dep. at 31:21 - 32:8.* As stated, *supra*, maintaining communication with SCS members, while eliminating independent retailers from the marketplace was a primary goal of Mission 3000.

30. Defendant's big push to open its own corporate stores began in or around 1999/2000. Authorized retailers expressed concern that defendant was now competing with its own retailers. *Bono Dep. at 32:9-19.* Indeed, defendant's corporate galleries are in direct competition with its authorized retailers. *Bednarski Dep. at 49:6 - 50:16.*

31. With the exception of retailers who only carried the Crystal Moments line of defendant's products, and did not carry any other line, Bono - a district sales manager for fifteen (15) years - has never terminated an authorized retailer's license because of the way defendant viewed distribution. *Bono Dep. at 34:17 - 36:4.* Yet, according to defendant, key to its decision in terminating plaintiff's authorized retailer license was the change in its distribution strategy. If that were the case, wouldn't it stand to reason that some of Bono's accounts would also be terminated as a direct result in this attitudinal change regarding distribution?

32. Bono never received any lists from defendant suggesting the closure of stores for any reason other than low volume. *Bono Dep. at 39:14-17.* At no time did Bono ever receive instructions from defendant that "ugly stores" needed to be closed. *Id. at 43:1-4.* Bono never even suggested to Whitney that any "ugly stores" needed to be closed.

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

*Id. at 43:21 - 44:3.* Neither Bednarski nor Monica Pederson ("Pederson"), plaintiff's initial sales manager, ever suggested to Bono that an "ugly store" needed to be closed. *Id. at 44:17-24.*

33. Bono never had a clear understanding regarding Mission 3000. He was never given anything in writing and except for the field trip in 2000, he never heard the phrase "Mission 3000" again. It meant absolutely nothing to him as a regional sales manager and it did not change the manner in which he supervised his region and the retailers in his region. *Bono Dep. at 45:25 - 46:22.* Yet, in its answers to interrogatories, defendant relies primarily on Mission 3000 as the justification for the termination of plaintiff's authorized retailer license. *See Mason Cert. Exhibit E at number 4.*

34. Part of Bednarski's duties and responsibilities as a district sales manager **did not** include assessing an account's display of defendant's product or how the account promotes the product. Further, her duties and responsibilities **did not** include determining whether or not a particular account was complying with the Standards. *Bednarski Dep. at 23:3-24.* Why, then, did McFarland instruct Bednarski to make the initial recommendation terminating plaintiff's authorized retailer license?

35. Not much emphasis was placed on the Standards. Rather, they were treated as boilerplate, "shelf" documents each retailer was required to execute. Bednarski, as a district sales manager, would briefly review with the retailer the Standards, together with all of the other paperwork. However, Bednarski was never given any training with respect to the Standards, how to interpret them, how to review them, or any important elements to specifically bring to the retailer's attention. *Bednarski Dep. at 30:16 - 31:14.*

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

36. Bednarski never had any conversations with plaintiff during which she advised that plaintiff had been rated poorly, or that plaintiff needed to change certain things about its operation, appearance or promotion of defendant's product. *Bednarski Dep. at 41:6-11.*

37. Having one of her accounts closed would, obviously, be directly adverse to Bednarski's economic interests. If she heard rumors that one of her accounts was being targeted for closing, or if one of her accounts was being considered for termination, she would do anything she could to fix whatever the problem was so that she would maintain that account. *Bednarski Dep. at 48:3 - 49:5.*

38. Although Bednarski heard of Mission 3000 at a sales meeting, she was never given any "marching orders" with respect to what, if anything, she was expected to do in the wake of Mission 3000. **Not one** (1) of Bednarski's accounts was closed as a result of Mission 3000 (with the exception of plaintiff who, according to defendant, was closed in accordance with the parameters of Mission 3000). In fact, when specifically asked if any of her accounts were closed as a result of Mission 3000, Bednarski did not even reference plaintiff! *Bednarski Dep. at 51:21 - 54:11.*

39. There was never a time during Bednarski's business relationship with plaintiff when she needed to discuss any problems at plaintiff's business. She never had any conversations with McFarland or Bono regarding problems with plaintiff's account. *Bednarski Dep. at 56:17 - 57:5.*

40. By letter dated January 15, 2003 (the "Termination Letter"), *annexed as Exhibit F to the Mason Cert.,* defendant, without any prior notice, terminated plaintiff's

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

status as an authorized retailer.

41. The Termination Letter made several factual representations, including: (a) the termination resulted from a review of defendant's business relationship with Plaintiff; (b) defendant made the decision to terminate plaintiff's authorized retailer status only after an extensive review of the business relationship by all levels of sales management; (c) if plaintiff had any concerns regarding the termination of the business relationship not addressed in the Termination Letter, plaintiff could contact defendant's offices and would receive a written response within ten (10) business days.

42. Bednarski never participated in any sort of review of plaintiff's business for the purpose of determining whether or not to terminate plaintiff's authorized retailer license. Rather, she was simply told to do so and author the e-mail to McFarland. *Bednarski Dep. at 60:8-24.* In fact, the record is void of any evidence whatsoever demonstrating that any kind of "review" of the parties' business relationship precipitated plaintiff's termination, let alone an "extensive review of the business relationship by all levels of sales management."

43. At some point after the October 2002 training session to which plaintiff was invited, McFarland instructed Bednarski not to communicate with plaintiff. McFarland told Bednarski that plaintiff was an "ugly," that the account was going to be terminated and that a closure letter would be sent shortly. *Bednarski Dep. at 61:7 - 62:23.* This exchange begs several questions. First, McFarland testified that in August 2002, when she and Bednarski visited plaintiff's store, that she had instructed Bednarski to initiate closure proceedings. If she had this conversation in August, why would she need to re-

iterate this information in late 2002? Second, why wasn't the conversation more along the lines of, "Hey, Danielle, I told you to close this account several months ago. Why haven't you done it?" Yet, that was not the conversation Bednarski recounted in her testimony. Third, during her deposition, when asked about this conversation with Bednarski, which occurred sometime after the October 2002 training session and the date on which the Termination Letter was sent, Bednarski failed to make reference to any prior conversations with McFarland of the same nature regarding plaintiff.

44. If Bednarski knew that plaintiff's authorized retailer license was going to be terminated, she never would have invited them to the October 2002 training session!! *Bednarski Dep. at 63:14-24.* This one (1) piece of testimony wholly belies McFarland's testimony about an August 2002 conversation with Bednarski during which Bednarski was told to close plaintiff's account. According to Bednarski, had that conversation actually took place, she would have been on notice that plaintiff's license was going to be terminated and she would have never invited them to the training session.

45. During McFarland and Bednarski's visit to plaintiff's business in August 2002, there were no conversations with plaintiff regarding any problems with the store. *Bednarski Dep. at 64:8 - 65:13.* Indeed, it was a positive visit. *Schulman Dep. at 75:2 - 76:10.*

46. Interestingly, the reasons McFarland gave Bednarski for classifying plaintiff as an "ugly" are characteristics of stores currently in Bono's territory. *Bednarski Dep. at 65:14 - 66:1 and Bono Dep. at 12:11 - 13:19.*

47. One of the reasons McFarland gave for terminating plaintiff's a

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

authorized retailer license was that plaintiff carried "lower end products." Yet, Bednarski acknowledged that several products carried by plaintiff, such as Armani, Hummel, Waterford and Lladro, were not lower-end products. *Bednarski Dep. at 2-10.*

48. During their August 2002 visit to plaintiff's store, McFarland questioned Bednarski about plaintiff's increase in revenue over the preceding year. *Bednarski Dep. at 66:17 - 67:3.*

49. McFarland instructed Bednarski to prepare and send the November 26, 2002 e-mail, *annexed as Exhibit C to the Mason Cert.* Bednarski believes that McFarland was getting pressure from Whitney to close plaintiff's account because regardless of what Bednarski said, such as referring to the significant revenue plaintiff was generating and perhaps exploring ways to fix whatever problems existed, McFarland continued to insist that the account had to be closed. The closure made no sense to Bednarski. *Bednarski Dep. at 69:7 - 72:6.*

50. This was the one (1) and only time that McFarland has ever asked Bednarski to prepare an e-mail like that prepared in connection with plaintiff's closure. *Bednarski Dep. at 73:2-9.*

51. There are still authorized retailers selling defendant's products who, according to Bednarski, would not be opened today because they did not conform to what she understands to be the Mission 3000 standards. *Bednarski Dep. at 75:17-23.*

52. Bednarski recalled absolutely nothing negative about plaintiff's store during the entire time she serviced it. *Bednarski Dep. at 79:10-15.*

53. Other retailers have asked Bednarski if the termination of plaintiff's

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

authorized retailer license was triggered by plaintiff's internet sales. *Bednarski Dep. at 80:8-16.*

54. The August 2002 visit was the only time that McFarland had ever seen plaintiff's store. *Bednarski Dep. at 84:2-10.*

55. Plaintiff went to great lengths to become one of defendant's authorized retailers. *Schulman Dep. at 15:2 - 24:22.*

56. Plaintiff executed its application in April 1999, but was not approved as an authorized retailer until October 1999. *Schulman Dep. at 18:13-15.* No one ever explained to plaintiff the parameters of the contract with defendant. The papers were simply placed on the table and plaintiff was told to sign them. *Id. at 21:13 - 23:1; 27:10-17; 28:16 - 30:21.* No one ever discussed or explained the Standards with plaintiff. *Id. at 52:23 - 53:24.*

57. Plaintiff specifically set aside space for defendant's product. *Schulman Dep. at 35:17 - 36:7.*

58. At the time plaintiff became an authorized retailer, no one ever indicated that its license could be terminated at any time without reason. *Schulman Dep. at 47:19 - 48:1; 55:17-20.* Rather, plaintiff naturally and reasonably concluded that if they did a good job, sold product and made money for defendant, its license would never be at risk. *Id. at 44:14 - 46:3.*

59. Between the time that plaintiff was approved as an authorized retailer in October 1999 and January 2003 when plaintiff received the Termination letter, there were absolutely no changes whatsoever made to plaintiff's store. *Schulman Dep. at 51:19 -*

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

*52:22.*

60. After Pederson left the company, Bednarski became plaintiff's district sales manager. From the point in time when Bednarski took over for Pederson, right through October 2002 when Bednarski invited plaintiff to the "key account" training session, everything was always positive. During the August 2002 meeting with Bednarski and McFarland, plaintiff specifically recalls McFarland asking how plaintiff had increased its revenue so significantly, at which time plaintiff indicated, among other things, that they spend a great deal of time, energy and money on their website and internet sales. Plaintiff always made sure that it was listed number 1 on any Google search for defendant's product. *Schulman Dep. at 58:16 - 65:23.* Interestingly, after plaintiff's termination, defendant now has the number one spot in a Google search for defendant's product. *Id. at 66:4 - 67:3.*

61. The August 2002 meeting with McFarland and Bednarski was very positive. McFarland even gave plaintiff an authorized retailer application for its new store in Freehold, New Jersey. Everything about the meeting was positive. In fact, plaintiff spoke with Bednarski later in the day and Bednarski indicated that everything had gone well. *Schulman Dep. at 75:2 - 76:10.*

62. Hermann's Crystal, a California-based authorized retailer, was also closed at or about the same time as plaintiff. Indeed, the district sales manager's recommendation to the regional sales manager that Hermann's Crystal be closed came less than two (2) weeks prior to Bednarski's e-mail to McFarland. *Mason Cert. Exhibit G.* Curiously, Hermann's Crystal, like plaintiff, invested a significant amount of time, energy and money on internet sales and was always in the top three (3) in a search for defendant's

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

product. *Schulman Dep. at 77:18 - 79:8.*

63. In July 2001, defendant announced that it was going to sell directly to consumers over the internet. *Schulman Dep. at 91:1-14.* Along with this announcement, defendant changed its packaging and included promotional material that invited consumers to visit www.swarovski.com where they could buy direct from defendant. *Schulman Dep. at 92:11 - 93:23.*

64. From the time that plaintiff was an approved retailer in October 1999 through the date of the Termination Letter, no one ever expressed to plaintiff any problems with plaintiff's store or the way it promoted defendant's product. No one ever told plaintiff that it was damaging or impairing defendant's name or reputation, or that the way in which plaintiff marketed or sold defendant's product negatively impacted defendant's image. In fact, Bednarksi supported plaintiff's efforts. Plaintiff never received any type of evaluation or assessment of its store at any time, and at no time did anyone tell plaintiff that an assessment had been done on plaintiff's store. *Schulman Dep. at 121:17 - 122:23.*

65. Subsequent to receiving the Termination Letter, plaintiff asked defendant to provide any and all information or material that comprised the "extensive review" of the parties' relationship and which ultimately led to the termination of plaintiff authorized retailer status. Defendant never responded to plaintiff's requests.

66. James B. Rego ("Rego"), the manager for customer financial services, only heard the phrase Mission 3000 within the week preceding his April 12, 2005 deposition. *April 12, 2005 deposition of James B. Rego at 15:16-19.*

67. Whitney was defendant's national sales manager until his March 4,

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

2005 resignation. *April 13, 2005 deposition of Michael Whitney at 5:6-10.* As national sales manager he reported to Morton. *Id. at 6:16-19.*

68. Before terminating an account, Whitney would speak with Morton regarding the reasons for termination, the procedure for termination and whether or not the account should, in fact, be closed. *Whitney Dep. at 7:11 - 8:6.* The record is void of any discussions between Whitney and Morton regarding the termination of plaintiff's authorized retailer license. In fact, the record is void of any testimony or other evidence remotely suggesting that Morton knew about the termination of plaintiff's account or participated in the decision.

69. Whitney claimed that while he was doing a customary search on the internet for companies who unlawfully use defendant's name he came across plaintiff's website and that he was concerned about plaintiff's pricing strategies because they discounted. Yet, he acknowledges that other retailers discount and have not been closed. *Whitney Dep. at 9:8 - 11:4.* Further, as set forth, *supra*, discounting defendant's products is not something that is prohibited. *See also Id. at 16:13-14.* The practice certainly appears nowhere in the Standards.

70. Whitney then called McFarland and had, what appears to be from his testimony, a 60 second conversation regarding the termination of plaintiff's retailer license. *Whitney Dep. at 17-22.* This conversation appears to be the extent of the "extensive review of the business relationship by all levels of sales management" referenced in the Termination Letter.

71. There was a time when defendant attempted to determine whether

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

certain accounts should still be considered an authorized retailer. Defendant "went around to a number of accounts to try to adjust [their] eyes as to what was appropriate for the Swarovski distribution ...." That occurred in or about June 2000, approximately two and a half (2 ½) years prior to plaintiff's closure! *Whitney Dep. at 14:5 - 15:10.*

72. *Annexed to the Mason Cert. as Exhibit H* is a document bate-stamped SNA 1077 and labeled "SDI Procedures." SDI stands for Strategic Distribution Improvement which was defendant's distribution model **prior to** Mission 3000. Yet, this document is dated 2002, **after** the August 2001 implementation of Mission 3000. A review of the document reveals that it contains nothing related to the image of a retailer, or how a retailer enhances defendant's product. Rather, the document focuses solely on dollars and volume.

**PHARMACY SERVICES, INC.**

By Its Attorneys

KLAFTER & MASON, L.L.C.

Gary L. Mason (4835)
Manalapan Corporate Plaza
195 Route 9 South - Suite 204
Manalapan, New Jersey 07726
(732) 358-2028
(732) 358-2029 (fax)

LAW OFFICES OF CAROL A. ZANGARI

Carol A. Zangari (2130)
The Wilcox Building
42 Weybosset Street
Providence, Rhode Island 02903
(401) 831-1999
(401) 454-8309 (fax)

Dated: August 12, 2005

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **PHARMACY SERVICES, INC., t/a ROSELLE CENTER PHARMACY, a/k/a Roselle Center Card, Gift & Collectibles,** **Plaintiff,** vs. **SWAROVSKI NORTH AMERICA, LTD., JOHN DOES 1-50 and ABC CORPS. 1-10,** **Defendants.** | **Case No. 04-72T** **Civil Action** |

## CERTIFICATION OF SERVICE

**GARY L. MASON, ESQ.**, of full age, being duly sworn according to law, upon his oath, certifies as follows:

1. On August 12, 2005, I forwarded, via overnight mail, to the Clerk of the United States District Court, District of Rhode Island, One Exchange Terrace, Providence Rhode Island 02903, an original and two (2) copies of:

a. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment;

b. Certification of Gary L. Mason, Esq. in Opposition to Defendant's Motion for Summary Judgment;

KLAFTER & MASON, L.L.C.
*195 Route 9 South, Suite 204*
*Manalapan, New Jersey 07726*
*(732) 358-2028 · Fax: (732) 358-2029*

c. Plaintiff's: (i) Response to Defendant's Statement of Undisputed Material Facts and (ii) Opposing Statement of Material and Disputed Facts; and,

d. This Certification of Service.

2. On August 12, 2005, I forwarded, via overnight mail, copies of the above-referenced documents to:

Michael A. Gamboli, Esq.
Partridge, Snow & Hahn, L.L.P.
180 South Main St.
Providence, RI 02903

Carol A. Zangari, Esq.
42 Weybosset Street
Suite 402
Providence, RI 02903

I hereby certify that the foregoing factual statements made by me are true and accurate to the best of my information, knowledge and belief. I am aware that if any of the foregoing factual statements made by me are wilfully false, I may be subject to punishment.

Gary L. Mason

Dated: August 12, 2005